THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* THE BROOKLYN, FLATBUSH and CONEY ISLAND RAILWAY COMPANY, Respondent.

The provisions of the Railroad Acts (§ 1, chap. 282, Laws of 1854; § 1, chap. 469, Laws of 1873 ; § 1, chap. 710, Laws of 1873) authorizing the purchasers on foreclosure sale of the property and franchises of a railroad corporation, to organize a new corporation for the purposes of the transfer, do not prevent a sale or transfer by such a purchaser to a corporation already existing and capable of holding the property and exercising the franchises ; the authority so given by said provisions was intended to meet a case where there is no such existing corporation.

It is not essential for the purchasing company to file a map of the line thus acquired where it is already constructed.

The provision of the State Constitution (Art. 3, § 18) prohibiting legislation authorizing the " construction or operation of a street railroad," except in the cases specified, is prospective in its operation, and has no reference to or effect upon previously existing laws.

Accordingly, *held*, that said provision did not affect the provision of the Railroad Act of 1839 (§ 1, chap. 218, Laws of 1839) authorizing railroad corporations to contract with other like corporations " for the use of their respective roads ; and that a contract between a railroad company which had acquired the right and had constructed and was operating a road over Atlantic avenue in the city of Brooklyn, and the defendant, by which the latter was authorized to run its trains over the road of the former on said street, was not forbidden by said constitutional provision.

The provisions of the Railroad Act of 1850 (Chap. 140, Laws of 1850) were not rendered inoperative as to railroads running " over, under, through or across streets, by the Rapid Transit Act, so called (Chap. 606, Laws of 1875), as by the latter act, it is declared that it " shall not be construed to repeal or *in any manner* to affect " the former.

By defendant's charter, its terminus in Brooklyn was " at or near Atlantic avenue;" its line, as shown upon the map and survey filed, stopped twelve feet south of the south line of the avenue. It acquired the right to run its cars upon the tracks of the L. I. Co. whose road was constructed along the center of the avenue, and tracks were constructed by the L. I. Co. connecting those of the two roads ; similar curved tracks had long been used by the L. I. Co. to reach its depot south of the avenue and for other purposes. The L. I. Co., by its charter, had the right to build such appendages as it deemed necessary, and branches when land was offered without expense. *Held*, that by defendant's charter its terminus was not necessarily south of the avenue, and there was nothing therein to prevent it from making such terminus in the center thereof where it could connect with the other road ; that the connecting tracks were

Statement of case.

authorized by the charters of the two companies, and the provision of the act of 1850 (§ 28, subd. 6), authorizing railroad companies to connect their roads, and in no respect could they be considered as a separate and independent line, and so requiring all the steps necessary to a newly-organized street railway.

The map required to be filed by a railroad company is sufficient if it shows the alignment and profile ; it is not essential that it should show all the connections, turnouts and switches.

At the time of the passage of the act of 1859 (Chap. 484, Laws of 1859), providing, among other things, for the relinquishment by the L. I. Co. of the right to use steam power within the city of Brooklyn, it was rightfully running its trains by steam through Atlantic avenue. In pursuance of that act it relinquished such right in consideration of a payment made to it, which was assessed upon property benefited, and the road was thereafter operated by horse power until 1876, when the common council of said city passed a resolution, authorizing the use of steam in drawing cars on said avenue, and the legislature passed an act (Chap. 187, Laws of 1876) authorizing such use by the L. I. Co., and immediately thereafter the use of steam power was resumed. In 1879 defendant under its contract ran its cars on the avenue in the same way. *Held,* that the act of 1876 removed the restriction, leaving the original charter power of the L. I. Co. in full force ; that it had the right to determine what motive power should be used, both as to its own cars, and as to others which it could lawfully permit to come upon its road ; and as, by its lease to defendant, the latter was authorized to use steam power, it could lawfully use it to run its cars on the avenue.

Also *held,* that said act of 1876 was not violative of the provision of the State Constitution (Art. 3, § 18) which prohibits the passage of any private or local bill granting " any exclusive privilege, immunity or franchise whatever."

Also *held,* that the question, whether said act was violative of the constitutional prohibition against legislation impairing the obligation of contracts, could not be presented in actions brought by the State against defendants to which the assessed land-owners, who alone had such contract rights, if any existed, were not parties.

It is the duty of this court to determine a constitutional question only when it is directly and necessarily involved in the issue to be determined.

*It seems* that it is only when some person attempts to resist the operation of an act claimed by him to impair the obligation of a contract, and calls in the aid of the judicial power to pronounce it void as to him, his property or rights, that the objection of unconstitutionality can be presented and sustained.

The attorney-general, in an action brought by him, represents the whole people and a public interest. No question can be presented in such action affecting only mere individuals and private rights.

(Argued April 10, 1882 ; decided May 2, 1882.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, affirming a judgment in favor of plaintiff entered upon an order dismissing the complaint on trial.

The nature of the action and the material facts are stated in the opinion.

*W. C. Trull* for appellant. The only franchise acquired by the Coney Island and East River Company was the franchise to construct and operate a road between Atlantic avenue and Coney Island upon the line designated upon its map of location. It could not lawfully abandon any portion of its line or route. (*People* v. *Vt. R. R. Co.*, 24 N. Y. 267; *People* v. *Tubbs*, 49 id. 356; *Webb* v. *Forty-second Street, M. & S. R. R. Co.*, N. Y. Daily Register, February 12, 1881.) The agreement of consolidation being void, the defendant has never been incorporated and has never acquired the franchise, or right to construct or operate a railroad on Atlantic avenue, or elsewhere. (*Matter of B. W. & N. R. W. Co.*, 72 N. Y. 245.) Defendant's chartered rights were limited to the construction and operation of a railroad between the southerly line of Atlantic avenue and Coney Island. As soon as it crossed the line of Atlantic avenue, it overstepped the bounds and limits of its franchise. (*People* v. *Vt. R. R. Co.*, 24 N. Y. 267; *Thomas* v. *W. J. R. R. Co.*, U. S. Sup. Ct., 21 Alb. L. J. 409; *Presd't U. B. Co.* v. *T. & L. R. R. Co.*, 7 Lans. 246.) The act of the defendant in constructing the steam railway in Atlantic avenue was unauthorized, in that it was done without obtaining the consent of the common council of the city of Brooklyn. (Laws of 1850, chap. 140, § 28, subd. 5; Laws of 1864, chap. 582, § 1; Laws of 1854, chap. 140, §§ 1, 2; Laws of 1871, chap. 560, § 1; Laws of 1873, chap. 863, p. 1377, § 23.) The fact that the defendant has never obtained the consent required by the Constitution is conclusive against its right to construct or operate a railroad on Atlantic avenue. (Const., art. 3, § 18; Laws of 1854, chap. 141, § 1; Laws of 1860, chap. 10, § 1; Laws of 1873, chap. 863, p. 1377, § 23; Laws

of 1839, chap. 218, § 1; *In the Matter of Oliver Lee & Co. Bank*, 21 N. Y. 12; *People, ex rel. v. Trustees of Fort Edward*, 70 id. 28; *Falconer v. B. & J. R. R. Co.*, 69 id. 491; Laws of 1875, chap. 606, § 4.) It is not competent for a railroad corporation to lease its road to an individual. (*Woodruff v. Erie R. R. Co.*, 13 N. Y. Weekly Dig., No. 7, Nov. 1881, p. 162; *Abbott v. Johnstown, G. & K. R. R. Co.*, 9 N. Y. Weekly Dig. 545; 80 N. Y. 27.) The sole right acquired by Mr. Richardson as purchaser of the franchises and privileges of the Brooklyn and Jamaica Railroad Company was to associate with himself, as such purchaser, other persons, and to acknowledge and file articles of association as prescribed by statute. (Laws of 1854, chap. 282, § 1; Laws of 1873, chap. 469, § 1; chap. 710, § 1; Laws of 1874, chap. 430; Laws of 1876, chap. 440; Laws of 1869, chap. 917, § 9; Laws of 1875, chap. 108.) The lease from the Atlantic Avenue Railroad Company to the Long Island Railroad Company is void upon its face as being against public policy. (1 Redfield on Railways [5th ed.], 617; *T. & R. R. R. Co. v. Kerr*, 17 Barb. 601; *Copeland v. Citizens' Gas Co.*, 61 id. 60; *Wood v. Truckee Co.*, 24 Cal. 274; *Thomas v. W. J. R. R. Co.*, 11 Otto, 71; *Abbott v. J. G. & K. R. R. Co.*, 9 N. Y. Weekly Dig. 545; 80 N. Y. 27; Laws of 1839, chap. 218, § 1.) The act of 1876, which grants the right to use steam power upon Atlantic avenue, is unconstitutional. (Const., art. 3, § 18; Laws of 1876, chap. 187, p. 166; *Matter of Gilbert El. Ry. Co.*, 70 N. Y. 370.) The act of 1876 is also invalid, in that it impairs the obligation of the contract by which the Brooklyn and Jamaica and Long Island companies agreed not to use or permit the use of steam upon Atlantic avenue. (U. S. Const., art. 1, § 10; Laws of 1859, chap. 444, § 6; Laws of 1859, chap. 484, § 9; Laws of 1860, chap. 92, § 7; chap. 100, § 2; chap 460, § 4; Laws of 1873, chap. 432, § 2.) The grant of the right to use steam upon Atlantic avenue, as contained in the act of 1876, even if it be a valid law, is by the express terms of the grant limited to the corporations therein named, and is not assignable. (*Blackwell v. Wiswell*, 14 How.

Pr. 257; *Harding* v. *The St'mb't Munich*, 5 Law Rep. 106; *Mendenshall* v. *Klinch*, 51 N. Y. 246.) If, for any of the reasons heretofore advanced on the part of the plaintiff, the act of the defendant in constructing and operating a steam railway upon Atlantic avenue be unlawful, then those acts constitute a nuisance and should be enjoined by this court. (*Davis* v. *The Mayor*, 14 N. Y. 514, 525; *People* v. *Kerr*, 27 id. 193; *Fowler* v. *Saunders*, Cro. James, 446; *King* v. *Russell*, 6 East, 427; *Rex* v. *Carlisle*, 6 C. & P. 636; *Rex* v. *Cross*, 3 Camp. 226; *Rex* v. *Jones*, id. 230; *Rex* v. *Moore*, 3 B. & A. 184; *Comm.* v. *Passmore*, 1 S. & R. 219; *Rex* v. *Ward*, 4 Ad. & El. 334; *People* v. *Cunningham*, 1 Denio, 524; *Hart* v. *The Mayor*, 9 Wend. 571; 2 Story's Eq., §§ 921, 922; *Atty.-Gen.* v. *Cohoes Co.*, 6 Paige, 133; *Raines* v. *Baker*, Amb. 158; *Samson* v. *Smith*, 8 Sim. 272; *Spencer* v. *L. & B. R. R. Co.*, id. 193; *Att'y-Gen.* v. *Richards*, 2 Anst. 603; *Corning* v. *Lowerre*, 6 Johns. Ch. 439.) The commissioners were not officers or agents of the State, but were officers of the court by whom they were appointed, and were not acting solely in the interest of the State, but in the interest of the property-owners upon whose application they were appointed. (Laws of 1859, chap. 481, § 1; *Beard* v. *City of Brooklyn*, 31 Barb. 149; *McCullough* v. *Mayor*, 23 Wend. 459; *Lake* v. *Trustees of Williamsburgh*, 4 Denio, 523; *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518; *University* v. *People*, 99 U. S. 309; *State Bk. of Ohio* v. *Knoop*, 16 How. 369; *New Jersey* v. *Wilson*, 7 Cranch, 164.) There cannot be an extra allowance where the subject-matter is a mere right, not involving any claim of property, *e. g.*, a suit for an injunction. (*People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71; *Atlantic Dock Co.* v. *Libbey*, 45 id. 499; *Grissler* v. *Stuyvesant*, 67 Barb. 81.) Even if it be conceded that the State was a party to the contract, it by no means follows that it could abrogate it. (*Hall* v. *Wisconsin*, 103 U. S. 5, 11; *Walker* v. *Whitehead*, 16 Wall. 314, 317.) The position taken that it is beyond the scope and power of the legislature to abridge its legislative powers by contract is untenable. (*Keith* v. *Clark*, 97 U. S. 474;

*Murray* v. *Charleston*, 95 id. 444; *New Jersey* v. *Yard*,
id. 104; *Harrington* v. *Tennessee*, id. 679; *Humphrey* v.
*Pegues*, 16 Wall. 244; *Wilmington R. R. Co.* v. *Reid*, 13
id. 264; *Home of the Friendless* v. *Rouse*, 8 id. 430; *McGee*
v. *Mathis*, 4 id. 143; *Jefferson B'k* v. *Skelby*, 1 Black, 436;
*Dodge* v. *Woolsey*, 18 How. [U. S.] 331; *Gordon* v. *Appeal
Tax Court* [3 How.], 15 Curtis, 338.) The provision of the con-
tract prohibiting the use of steam was authorized by the act of
1860, which preceded it, and also validated by the subsequent
legislation, which confirmed the contract and recognized it as
in force. (Laws of 1873, chap. 432, § 2; *Brown* v. *Mayor*,
63 N. Y. 239.)   There is no force in the contention that treat-
ing the contract in question as a simple relinquishment of the
right to use steam on the avenue, the companies were at liberty
to resume the use of steam at pleasure, if the legislature so
authorized.   (*Fletcher* v. *Peck* [6 Cranch], 2 Curtis, 337.)
The provision of the act of 1860 (Chap. 460), making the con-
tract binding upon any corporation using the road, and the act
of 1859 (Chap. 484, § 6), prohibiting the use of steam and re-
pealing all laws authorizing its use by either of the companies,
amount to a covenant upon the part of the State that it would
not thereafter restore the right to use steam. (*Binghamton
Bridge*, 3 Wall. 51, 81; *Bridge Proprietors* v. *Hoboken Co.*,
1 id. 116.)   The constitutional provision prohibiting a State
from passing a law impairing the obligations of contracts
equally prohibits a State from enforcing, as a law, an enactment
of that character, from whatever source originating. (*Williams*
v. *Bluffy*, 96 U. S. 184; *Farrington* v. *Tennessee*, 95 id. 682.)
The burden of proof is on the defendant to show its right to
maintain and operate a railroad upon Atlantic avenue, and to
use steam power thereon. (*People* v. *Utica Ins. Co.*, 15 Johns.
387; Angell and Ames on Corporations, § 756; High on Ex.
Rem., § 652; *People* v. *Thatcher*, 55 N. Y. 528.)

*E. B. Hinsdale & William C. De Witt* for respondent.
The defendant's incorporation and the consolidation of the
two former corporations leading thereto were, in all respects,

valid. (Laws of 1869, chap. 917; *Hentz* v. *L. I. R. R. Co.*, 3 Barb. 646; *People* v. *N. Y. C. & H. R. R. R. Co.*, 74 N. Y. 302; Pierce on Railroads, 254.) The defendant had a lawful right to cross the southerly sidewalk and half of Atlantic avenue, to the old railroad bed of the Long Island Railroad Company, in the center of that avenue. (*Bissell* v. *N. Y. C. R. R. Co.*, 23 N. Y. 61; *Walton* v. *Lift*, 14 Barb. 216.) Aside from constitutional questions, the use of defendant's cars upon Atlantic avenue, under the contract with the Long Island Railroad Company, was authorized by law. (*Fisher* v. *N. Y. C. & H. R. R. R. Co.*, 46 N. Y. 644; *Blossburgh & C. R. R. Co.* v. *Tioga R. R. Co.*, 1 Abb. Ct. of App. Dec. 149; *Parker* v. *R. & S. R. R. Co.*, 16 Barb. 315.) The act of 1876 restoring the use of steam power upon the old railroad bed of Atlantic avenue by the corporation in possession thereof, or its lessees, was constitutional and valid. (*Ft. Plain Bridge Co.* v. *Smith*, 30 N. Y. 44; *Cayuga Bridge Co.* v. *Magee*, 2 Paige, 116; *Matter of Binghamton Bridge Co.*, 3 Wall. 51; reversing 27 N. Y. 87; *B. & L. R. R.* v. *S. & L. R. R.*, 2 Gray, 1; *Mohawk Bridge Co.* v. *Utica R. R.*, 6 Paige, 554; *C. R. Bridge Co.* v. *Warren Bridge Co.*, 11 Peters, 420; *Richmond R. R. Co.* v. *L. R. R. Co.*, 13 How. [U. S.] 71; *People* v. *Bowen*, 30 Barb. 27; *B. & N. Y. R. R.* v. *Dudley*, 14 N. Y. 366; *Saratoga P. R. Co.* v. *Thatcher*, 11 id. 102; *Matter of N. Y. El. R. R.*, 70 id. 327; *Rogers* v. *Bradshaw*, 20 Johns. 735; *Jerome* v. *Ross*, 7 Johns. Ch. 315–342; *Newton* v. *Comm'rs of Mahoning*, 100 U. S. 548; *People* v. *L. I. R. R. Co.*, 9 Abb. N. C. 181.) The contract made with the commissioners under the act of 1859 did not operate to prohibit the future use of steam power at any time thereafter when the legislature should see fit to grant the right. (*Newton* v. *Comm'rs of Mahoning*, 100 U. S. 548; *Presbyterian Church* v. *New York*, 5 Cow. 538; *Britton* v. *The Mayor*, 21 How. Pr. 251; *Matter of Oliver Lee*, 21 N. Y. 9; Cooley on Const. Lim., § 340, etc.) A railroad lawfully in a public street is not a nuisance. (*Kellinger* v. *Forty-second Street R. R. Co.*, 50 N. Y. 206; *People* v. *Kerr*, 27 id. 188; *Wager* v.

*T. U. R. R. Co.*, 25 id. 526; *In re Prospect Park & C. I. R. R. Co.*, 8 Hun, 30.)

FINCH, J. The questions argued in this case are numerous and important, but are not all within a just construction of the issue raised by the pleading. The action was brought by the State, through its attorney-general, against the defendant corporation, to restrain it from running its cars and locomotives along and upon Atlantic avenue in the city of Brooklyn. The defendant is sued by its corporate name; it is sought to be enjoined as a corporation; and its existence as such is nowhere in the complaint denied. Its right to run its cars from Atlantic avenue to Brighton Beach is not questioned or challenged; and while its origin, as the product of a consolidation, is stated, and the lines of the two absorbed companies, as laid down on their respective maps, are alleged to have been parallel and competitive, yet the corporate existence of the defendant is assumed, and the fair scope and purpose of the action is not to assail its existence and adjudge its usurpation of corporate rights, but to keep it within its chartered limits and the boundaries of its franchise. If there are defects in its organization, it will be time enough to consider them when the rights which it exercises are in some form directly menaced. The investigation, therefore, will be narrowed to two questions, viz.: Whether the defendant has the right to run its trains on Atlantic avenue at all; and, if it has, whether it is at liberty to operate them by steam.

What was known as the Brooklyn and Jamaica Railroad Company was organized in 1832 (Chap. 256), and was authorized to construct and maintain a railroad with a single or double track, "and with such appendages as may be deemed necessary for the convenient use of the same," from any eligible point in the village of Brooklyn to any point within the village of Jamaica, and also of constructing and using a single or double lateral railroad, southward to the then village of Flatbush, and northward to Flushing. It was further provided that it should make use of no street or lane, nor run with steam power within the village limits, without the permission of the

corporate authorities of Brooklyn first had and obtained. The company constructed its road, and began its operation in 1835. It obtained by purchase or condemnation a right of way, eighty feet wide, upon and along what has since become a part of Atlantic avenue, in the city of Brooklyn, and operated its road with steam, presumably with the consent of the village authorities.

In 1834 the Long Island Railroad Company was chartered (Chap. 178) and authorized to build a single or double track, with such appendages as it deemed necessary, from a point in or near Greenport through the middle of Long Island to the water's edge in the village of Brooklyn, at a point to be designated by its trustees, and to prescribe " by what force the carriages to be used thereon may be propelled," but was put under a condition, as in the case of the prior company, not to use any street or lane, or run with steam power in Brooklyn without the previous permission of its trustees. This road obtained the permission and was operated by steam. In 1836 (Chap. 94) the Brooklyn and Jamaica Company was authorized to lease or sell its road to the Long Island Company, and appears to have made such lease at about that date, which was surrendered in 1860 and renewed at some time in 1867. The Long Island Company was further authorized in 1839 (Chap. 277), to build any branch railroads, " in any part of Long Island," as it should deem expedient and necessary, in cases where the land-holders offered the land required free of expense.

In 1853 (Chap. 220) an act of the legislature provided that every railroad company on Long Island, whose road had been constructed and was in use, should have the right to propel its cars with " the like motive power" as that then employed, upon condition that the strip of land on the south side of Atlantic avenue, between Gowanus lane and Clason avenue, should be ceded to the city of Brooklyn for a public street, by the Brooklyn and Jamaica Company, which owned the same, and both parties were authorized to contract accordingly. In 1855 that agreement was made, both companies joining in it, and the city, in exchange for the land received by it, giving to the

railroads a right of way thirty feet wide through the center of Atlantic avenue, and the full right and authority to operate their roads by steam.

It is entirely clear, therefore, that at the date of this contract, each of the two companies by force of their charters, by the assent of the village and the city of Brooklyn, and by the contract with the latter made under legislative sanction, had acquired and possessed the right to operate their roads with steam power upon and along Atlantic avenue in Brooklyn. It remains to see how the defendant became a sharer in that right.

In 1855 the Brooklyn and Jamaica Company mortgaged its property and franchises in the usual form. That mortgage was foreclosed, and, upon the sale ordered by the court, all the property and franchises mortgaged were purchased by William Richardson, who thereafter, and in 1874, conveyed all his rights to the Atlantic Avenue Railroad Company. This corporation was already in existence, having filed its articles of association under the General Railroad Act on the 1st day of May, 1872, and its route including Atlantic avenue and other streets of the city. It is claimed that this conveyance was inoperative on the ground that under the statute the purchaser could only associate with himself other persons and so form a new corporation to which the property and franchises could be transferred. That is a plain misconstruction of the act. (Laws of 1854, chap. 282, § 1; Laws of 1873, chap. 469, § 1, and chap. 710, § 1.) Before these acts were passed, such a railroad mortgage, while it certainly covered the special and peculiar franchises of the company, could with difficulty be construed to cover its corporate life, or right to be a corporation, and the subject created doubts. That right, it was argued, could scarcely be said to pass to a purchaser by virtue of his purchase, and could only be given by the authority of the State. Unless, therefore, the purchaser could find some corporate body in existence, capable of holding and exercising the franchises purchased, he stood in the awkward predicament of owning a property which it was not certain he could either use or sell. It was to cure this difficulty that the act of 1854 and its subsequent amendments

were designed. In the absence of an existing corporation, capable of taking and exercising the franchises sold, the purchaser was authorized to create a new corporation for the purposes of the transfer, but whose corporate life came from the grant and authority of the State. It is quite evident that this authority was intended only to meet a possible emergency, and not at all to prevent a sale or transfer to a corporation already existing, and capable under the law of its creation of holding the property and exercising the franchises which passed to the purchaser by the mortgage sale. We think, therefore, that the deed of Richardson was operative to convey to the Atlantic Avenue Company, all the property and rights of the mortgagor except barely the corporate life of the latter; and that the omission of the purchasing company to file a map of its line thus acquired was of no consequence, since it bought a road already constructed and in existence.

In 1877 the Atlantic Avenue Company leased all that portion of its road from near Flatbush avenue to the city line to the Long Island Company, and in 1879 both companies joined in a contract with the defendant by which the latter was authorized to operate its trains over the road of the former on Atlantic avenue. The right of the defendant, as derived from such two companies, to run its cars over Atlantic avenue, is entirely plain, if its contract was valid, and if it had or acquired the right to make the necessary connection by crossing the south line of the avenue. Both of these propositions are here in dispute.

The invalidity of the contract is put mainly upon two grounds, each of which aims to modify if not repeal the provisions of the act of 1839 (Chap. 218, § 1) by the authority of which the contract was made. That act made it lawful for any railroad corporation to contract with any other railroad corporation "for the use of their respective roads, and thereafter to use the same in such manner as may be prescribed by said contract." It is argued that the constitutional provision of 1875 (Art. 3, § 18) is a restriction upon legislative power, and applies to the act of 1839, and forbids a contract under it

for running through the streets of a city without first obtaining
the prescribed consents. But the prohibition invoked is one
against future legislation, and has no reference to previously
existing laws. It commands the legislature not to " pass " a
private or local bill, for certain specified purposes, and ordains
that those purposes shall be accomplished through the aid of
general laws, and then restrains their range by a further con-
dition, that even by a general law the legislature shall not
authorize " the construction or operation of a street railroad"
except in certain cases. The whole scope of the section is to
dictate to the law-making power what it may or may not do
thereafter, what bills it may pass and what it shall not, and
not at all to affect or act upon past legislation which at the
time was entirely lawful. We have heretofore declared this
doctrine so plainly as to make unnecessary a more detailed dis-
cussion. (*In the Matter of the Gilbert Elevated Railway Co.*,
70 N. Y. 361.) But it is further claimed that under the act of
1875, known as the Rapid Transit Act, the defendant could not
acquire the right by contract or otherwise to operate a railroad
along or upon the city streets and avenues, except in accordance
with the terms and conditions of that act, and that the latter is
so repugnant to and inconsistent with the provisions of the
general act of 1850, as to make it plain that the latter is no
longer in force as to railroads running " over, under, through
or across " streets, avenues and places. But the Rapid Transit
Act expressly provides that it " shall not be construed to repeal
or *in any manner affect* chapter 140 of the Laws of 1850,"
etc. It is our duty to obey the mandate and not undertake to
construe the act in a manner which the legislature has for-
bidden. We entertain no doubt, therefore, that the contract
of the defendant with the two companies occupying Atlantic
avenue was valid, and gave it the right to run its cars upon
that avenue.

But the question now comes whether it could get there, and
whether its connection with the other roads was lawful ? Its
main line approached the avenue nearly at right angles. By
its charter its terminus in Brooklyn was " at or near Atlantic

avenue." Its line, as shown upon the map and survey filed, stopped twelve feet south of the south line of the avenue. To reach the tracks in that highway and connect with it, what is called in railroad parlance a "Y" was built. A double track curving to the westward was laid across the south line of the avenue and joined to the tracks in its center, and a similar curve at the east united with the avenue rails in that direction. These connecting tracks were built by the Long Island Company, but paid for by the defendant, and were laid in pursuance of the contract between the two companies, and for the purpose of making their arrangement effectual. Similar tracks had long existed before, though not in the same precise place, which had been used by the Long Island Company as a means of reaching its depot south of the avenue, and for purposes of handling freight. On this state of facts it is insisted on behalf of the appellant that these connecting curves constitute a new, separate and independent railroad, which could not be laid across or upon the avenue without all the steps and conditions applicable to a newly-organized street railway.

Our first inquiry then is, whether these connecting curves are a separate and independent line, or a part of the authorized and chartered line of the defendant on the one hand, or the Long Island road on the other? Under its charter, the northern terminus of the defendant's line was "at or near Atlantic avenue," and the question raised is, whether by force of that phraseology its terminus was necessarily south of the avenue, or might be adopted at any point within it? In the case of *The Farmers' Turnpike Co.* v. *Coventry* (10 Johns. 389), the words "to the city of Hudson" were held not to terminate the road at the bounds of the city, but carried it within the city limits, and that such words must have a reasonable interpretation. In the *Mohawk Bridge Co.* v. *The Utica & Schenectady Railroad Co.* (6 Paige, 554), the words "at or near" the city of Schenectady. were held to give the right to enter the city limits. The *chancellor* said that the word "at," when it precedes the name of a place and denotes situation, frequently means the same as *in* or *within.* And in *Mason* v. *Brooklyn City & Newtown*

*R. R. Co.* (35 Barb. 377), the words "to terminate *at* Newtown," were held not to stop the road at its boundary, but to permit it to pass within. Of course the circumstances of a particular case must affect the construction, but we see nothing in the facts before us to indicate that the charter was intended to prevent the company from crossing the south line of the street, and making its terminus in the center where it could connect with another line. The fact that its line as mapped stopped short of that point is not conclusive. The same fact existed in the case last above cited, and the court held that, while the map was decisive on a question of route, it could not work a change of the termini, or an abandonment of a portion of the authorized road. In the present case even the appellant would be obliged to concede that notwithstanding the map filed the defendant could build the omitted twelve feet. If it could do that it could go to the center of the avenue if the language of the charter permitted. The map required to be filed is intended mainly for the purpose of acquiring property necessary to be taken, and is sufficient if it shows the alignment and profile without showing all the connections, turnouts and switches. But the Long Island road had a right to cross the south line of the avenue. It had done so for years. By its charter it had the right to build such appendages as it deemed necessary, and even branches where the land was offered without expense. It built these curves for a purpose consistent with its business and because deemed necessary to its successful conduct, and with the consent of adjoining land-holders. These facts taken in connection with the provisions of the act of 1850 which give the right to any company "to intersect, join and unite its railroad with any other railroad before constructed, at any point upon its route, and upon the grounds of such other company, with the necessary turn-outs, sidings, and switches and other conveniences in furtherance of the objects of its connection" (Laws of 1850, chap. 140, § 28, sub-div. 6), seem to us to make it our duty to hold that these curves were authorized by the charters of the companies, and were in no just sense or respect a separate and independent road. As a consequence the objections founded upon that idea,

that the curves were in excess of defendant's charter, that the common council did not consent, that a map of the curves was not filed, that their construction was prohibited by the charter of 1873, and that the constitutional consents were not given, seem to us without force and inapplicable to the real situation. In reaching this conclusion we have not overlooked what are claimed to be the alleged admissions in the answer. It would be an unreasonable and too rigid construction to hold that they related to the terminus of the line instead of to its general route.

The question which remains is the most important of all. It is, whether the defendant is entitled to run its trains on Atlantic avenue by steam power? Whether that question is fairly in the case has occasioned us not a little of doubt and hesitation. It would not be an unreasonable construction of the complaint that it challenged only the defendant's right to run on Atlantic avenue; but as another construction is possible, and the question of motive power has been very fully and ably argued on both sides, we have thought it best to meet it.

In 1859 the Brooklyn and Jamaica Company and the Long Island Company were running their trains up and along Atlantic avenue rightfully, and with the full authority and consent of the State and the city. In that year the legislature passed an act (Laws of 1859, chap. 484) to provide for the closing of the tunnel of the Long Island Railroad Company, in Atlantic street, and for the relinquishment by said company of its right to use steam power within the city of Brooklyn. The act authorized the common council, upon the petition of a majority of land-owners within the district of proposed assessment, to apply to the Supreme Court for the appointment of three commissioners, who should be empowered to contract with the Long Island Company and the Brooklyn and Jamaica Railroad Company, to relinquish the use of steam within the city limits, in consideration of a payment not exceeding $125,000, which sum was to be raised by assessment upon property benefited, within a certain specified area. The act provided, that upon the confirmation of the report of the commissioners, the right of the two

companies to use steam power within the city limits should end, and repealed, as of that date, all laws conferring such right. The contract was made accordingly, the assessment levied and the money collected and paid, and the right to use steam surrendered. The road was thereafter operated by horse power until 1876, a period of about sixteen years. In that year came a change of purpose. The common council of Brooklyn, on the thirteenth of March, passed a resolution permitting and authorizing the use and operation of steam, and steam locomotives and cars on Atlantic avenue, between Flatbush avenue and the city line, by the Atlantic Avenue Railroad Company, or any railroad company acquiring, by lease or otherwise, the right so to use and operate the railroad on such avenue. In the succeeding month the legislature enacted that it should be lawful for the Atlantic Avenue Company, and the Long Island Company as its lessee, to run cars over the road on the avenue, from the city line to Flatbush avenue by steam power, subject to such rules and regulations as the city of Brooklyn might prescribe. Immediately after the passage of this act the Atlantic Avenue road resumed the use of steam power, and in 1877 the Long Island Company re-laid the track with heavier rail and better suited for the use of locomotives, and thereafter moved its trains by steam. In 1879 the defendant, under its contract with the two companies, ran over their road in the same way.

It is observable that the right of the two companies, the Long Island and the Atlantic Avenue, to use steam power under the consent of the city and the authority of the State is not assailed. They are not made parties defendant, their right is in no respect challenged; and it would, perhaps, be just to assume it as conceded for the purposes of the present action, and so limit the scope of the inquiry to the question whether the right regained by them could be by them shared with or transferred to the defendant corporation. That, at all events, is the preliminary inquiry. The Long Island Company had, by its charter, the express right to prescribe by what motive power its road should be operated. It could select and use any appliance it pleased. By the contract of 1860 it submitted to a

restriction upon that power which excluded steam. But the general power remained. The whole range of choice and invention, outside of the one excluded motor, was left. The act of 1876 removed that restriction, and removing it, left the original charter power in full force and without exception. Thereafter it could lawfully choose freely and unquestioned what motive power should be used upon its road. And this it could do, not only as to its own cars, but as to any others which it could lawfully permit to come upon its road. By the act of 1839 it was empowered to contract with any other railroad company ; not a company operated by this or that specific motive power, but operated by any, without regard to its special character; and the latter could use the road leased for such use in such manner as "may be prescribed by said contract." By its charter and by the act of 1839 the Long Island Company could dictate to the defendant the use of horses or permit it to use steam. It did the latter, and lawfully conferred the authority. It should be remembered that the use of steam was never by contract or statute forbidden to the defendant. On the contrary, it was organized as a steam railroad. Wherever it could lawfully go, it could go with its own authorized motive power, until it reached a locality where steam was forbidden. It went lawfully upon Atlantic avenue, and steam was not there and then forbidden. On the contrary, it was expressly authorized.

The question, therefore, comes down finally to the validity of the legislative authority which restored the use of steam upon the avenue. And here the absence of the two companies most deeply interested in that question makes itself very strongly felt. It raises an inference that such issue was not intended to be presented for our determination, but in the view we take of the case it seems to us best to waive the difficulty and determine the question as between the present parties and those only.

It is the State which sues. No private citizen is seeking to vindicate his individual rights. That would present a very different case from the one before us. It is the State, repre-

senting the whole people, which seeks to restrain the defendant from exercising a right which the State, representing the whole people, expressly conferred. That is the decisive answer except as to the constitutionality of the act conferring the authority. The State sues to abate a public nuisance, to stop an unlawful act, to restrain an usurped authority. But that is not a public nuisance which the State has expressly authorized ; that is not an unlawful act which the statute has permitted; that is not an usurped authority which is legitimate and granted by law. The State, therefore, must fail, unless—and that is the final inquiry — the act of 1876 restoring the authority is unconstitutional and void.

That act is claimed to violate the provision of the Constitution which prohibits the passage of any private or local bill granting "any exclusive privilege, immunity or franchise whatever." (Art. 3, § 18.) No "exclusive" privilege was given. The restoration of the right to use steam power was neither exclusive nor a monopoly. The monopoly lay, if anywhere, in the original grant of the right to build the road along its chosen line. The machinery it should use, the power it should adopt, were but incidents of the right. One of these was taken away and then restored. This was not a grant of a new franchise, but a restoration of suspended charter powers, or rather the removal of a restriction from their full and complete exercise. The *Elevated R. R. Cases* (70 N. Y. 361, 327) have substantially decided the question in favor of the constitutionality of such an act.

But it is said this act impaired the obligation of a contract, and the reasoning upon which this objection rests is founded upon a theory that the assessed land-owners were in some way parties to the contract, and had vested rights under it. But they are not here. Their contract rights, if they have any, are not before the court and we are not called upon to determine them. It is our duty to decide a constitutional question only when it is directly and necessarily involved in the issue to be determined. That is not the case here. If there was any contract, to which the assessed land-holders were parties, it was either be-

tween them and the State, or between them and the two rail-
road companies.  If it was between the land-owners and the
State, and amounted to a covenant by the latter not to restore
steam on Atlantic avenue, as is contended, it is enough to say
that the validity or invalidity of that contract is not here
involved.  That is a question to be settled between the parties
to such contract.  A statute is assumed to be valid until some
one complains whose rights it invades.  (Cooley on Const.
Lim., 163.)  The land-owners are not here complaining.
We do not know that they ever will.  They have the power to
waive a constitutional provision made for their benefit.  (*Em-
bury* v. *Conner*, 3 N. Y. 511.)  Possibly they have already done
so, or may in the future.  We cannot know, and until they
come and present their contract and invoke the constitutional
protection, no tribunal is called upon to grant it.  The State
and the land-holders must be left to settle their own controver-
sies.  This one is between the State and the railroad companies.
It is only when some person attempts to resist the operation of
the act, "and calls in the aid of the judicial power to pro-
nounce it void as to him, his property or his rights, that the
objection of unconstitutionality can be presented and sus-
tained."  (*Wellington, Petitioner*, 16 Pick. 96.)  A legislative
act may be entirely valid as to some classes of cases, and
clearly void as to others.  (Cooley, *supra*, 180.)  So that we
are to leave the land-owners to vindicate their contract with
the State, if they have one, when they please and in their own
way.  But if, to avoid this answer, the ground is shifted to the
theory that the State, represented by its commissioners, was the
agent of the land-owners, in making the contract with the rail-
road companies, and in some manner represents the rights of
such land-owners in this action and prosecutes in their behalf,
the difficulty is that the necessary facts are wanting.  It is still
true that the attorney-general, in an action brought by him,
represents the whole people and a public interest, and not
mere individuals and private rights.  (*People* v. *Booth*, 32
N. Y. 397; *Davis* v. *The Mayor, etc.*, 14 id. 528.)  The
question which he can raise is over a public wrong and not

over a contract between individuals. The rights of the land-owners are personal to each, and not common to the whole people. If the former have a contract with the railroad companies which they have violated, the courts are open to the injured parties, and all their remedies are intact. If in such an action the act of 1876 should be relied upon as a defense, and it became necessary to attack it as unconstitutional because impairing the obligation of a contract, the question would be fairly presented and might have to be met. But it is not before us in this action. The sole question here is, whether the public have been wronged, whether a public nuisance exists, whether a franchise has been usurped or the limits of a charter exceeded. We decline, therefore, to consider the question in this action whether the contracts of individuals not parties before us have been improperly invaded, and must assume as against such objection the constitutionality of the act of 1876. We must hold, therefore, that it gave a valid authority, as against the State, to use steam power upon Atlantic avenue, and that the action was correctly determined in favor of the defendant and the complaint properly dismissed.

The judgment should be affirmed, with costs.

All concur, except DANFORTH, J., not voting, and TRACY, J., taking no part.

Judgment affirmed.