(27 Misc. Rep. 131.)

GALLAGHER v. KEATING et al.[1]

(Supreme Court, Special Term, Kings County. April, 1899.)

1. RAILROADS—TURNOUTS—RIGHT TO CONSTRUCT.
A city deeded a strip of land in a street to a railroad company and its lessees, successors, and assigns, with the right to use it for the purposes of tracks and turnouts in the same manner as on land ceded by it to the city. A successor of such company leased such strip to another, whose charter authorized it to maintain a railroad with necessary appendages. *Held*, that the lessee company could construct a necessary turnout from its tracks on such strip to a freight yard situated near it.

2. SAME—RIGHT TO CONNECT—INTERSECTION.
Under Laws 1890, c. 565, § 4, subd. 5 (Laws 1875, c. 606, § 26, subd. 3), authorizing any corporation formed thereunder to join or unite its railroad with any other railroad before constructed at any point on its route, the two roads need not actually intersect in order that a connection be authorized.

3. STREET RAILROADS—ELEVATED ROAD—RIGHT TO CONNECT.
Laws 1839, c. 218, re-enacted in Laws 1890, c. 565, § 78, makes it lawful for any railroad corporation to contract with any other railroad corporation for the use of their respective roads, or any part thereof. Laws 1875, c. 606, § 26, subd. 3 (Laws 1890, c. 565, § 4, subd. 5), which contemplated the construction of elevated street railroads, provides that any corporation formed thereunder may join or unite its railroad with any other railroad before constructed at any point on its route, and upon the grounds of such other road; and section 26, subd. 5, prohibits any elevated railway company formed under the act from using or occupying any streets except those designated for its route. Laws 1890, c. 565, § 129, prohibits any such company from constructing a street-surface railroad. *Held*, that an elevated railroad company could connect with a surface railroad company, and that they could agree for the use of each other's tracks, the connection being entirely on the latter company's land.

4. RAILROADS—VIADUCT—RIGHT TO CONNECT.
Where a city deeds a railroad company a strip of land in a street for the purpose of railroad tracks and turnouts, to be used and traveled over by cars and locomotives and otherwise, in the same manner as the tracks on land ceded by the company to the city, the company may construct a viaduct on such land to connect with an elevated railroad.

5. SAME—CONNECTING WITH FREIGHT YARDS.
Such company may also, by another viaduct, connect such viaduct with its freight yards, situated near such land.

6. NEW YORK CITY—CONNECTION OF RAILROADS—CONSENT OF ASSEMBLY.
The granting of permits by the highway commissioner of New York City to an elevated and a surface railroad to connect their tracks by a viaduct so as to enable each to operate its cars on the tracks of the other, does not create a new franchise, so as to require the consent thereto of the municipal assembly, under sections 72–74 of the charter.

---

[1] Affirmed on appeal, 57 N. Y. Supp. 632, 1123.

**7. SAME—AUTHORITY OF HIGHWAY COMMISSIONERS.**
Under New York Charter, §§ 524, 525, giving the commissioner of high-
ways cognizance and control of the laying or relaying of railroad tracks
in the streets, and providing that there shall be no disturbance of the
street except with his permission, he has authority to permit an elevated
railroad to connect with a surface road under an agreement for the use
by each of the other's tracks.

Action by John Gallagher against James P. Keating as commis-
sioner of highways of the city of New York and others. On motion to
continue an injunction pendente lite. Denied, and injunction dis-
solved.

Pearsall, Kapper & Pearsall (Isaac M. Kapper, of counsel), for
plaintiff.

Wm. J. Kelly, for defendant Long Island R. Co.

G. W. Wingate, for defendant Brooklyn El. R. Co.

R. Percy Chittenden, for city and city officers.

MADDOX, J. This is a motion to continue an injunction pen-
dente lite, and there is grave doubt whether this is the proper action
to justify the judgment plaintiff asks. It does not appear that
plaintiff is an abutting property owner on the line of either of the
railroads or of the proposed viaduct, nor is this action brought to
abate or restrain a nuisance; and the taxpayer's action, as authorized
by chapter 301 of the Laws of 1892, is one "to prevent any illegal
official act, * * * or to prevent waste or injury to, or to restore
and make good, any property, funds or estate of such * * *
municipal corporation," and in a proper case to enforce restitution of
corporate property, funds, or estate. Plaintiff, a taxpayer, seeks to
restrain the defendants the Long Island Railroad Company and Uhl-
man, as receiver of the Brooklyn Elevated Railroad Company, from
connecting the two roads by a viaduct and incline, and from operat-
ing the cars of the respective companies upon the road and tracks
of the other company; to restrain the Long Island Railroad Company
from constructing said viaduct over Atlantic avenue and certain in-
tersecting streets into its freight yards; from putting in an addi-
tional connection between its main double track line on Atlantic
avenue and one of its freight yards; and also to restrain the defend-
ants Keating and Farrell, respectively the commissioner and deputy
commissioner of highways in the city of New York, from permitting
the construction of such viaduct and connections. No fraud or
collusion is alleged in the complaint. No dishonesty in granting
the permits, the official act complained of, is charged; only that it is
an illegal act, involving a waste of corporate property, and that by
permitting the two roads to be connected by a viaduct and an incline,
and the consummation of a traffic agreement, thereby a new franchise
is acquired, the granting of which is solely within the power of the
municipal assembly. The Long Island Railroad Company, incorpo-
rated in 1834 (Laws 1834, c. 178), as lessee of the Atlantic Avenue
Railroad Company, has, since about 1877, been continuously in pos-
session of a strip of land in the center of Atlantic avenue, extending
from about 250 feet easterly from Flatbush avenue, 26 feet in width,
to Washington avenue, and thence 30 feet in width to the westerly
line of the former town of New Lots, upon which it has been operat-

ing its double-track steam surface railroad. Such strip of land was the property of the Brooklyn & Jamaica Railroad Company, acquired by it more than 40 years ago for steam-railroad purposes, and the Atlantic Avenue Railroad Company is now the owner of all the property and rights of said Brooklyn & Jamaica Railroad Company, including said strip, and which latter company was incorporated in 1832 (Laws 1832, c. 256). While the papers do not disclose when the Atlantic Avenue Railroad Company was incorporated, that it had succeeded to all the property and rights of said Brooklyn & Jamaica Railroad Company prior to said lease to the Long Island Railroad Company cannot now be questioned, nor can the validity of that lease (People v. Brooklyn, F. & C. I. R. Co., 89 N. Y. 85); and we also have judicial authority for the statement that its articles of association, under the then general railroad act, were filed on May 1, 1872 (Id.). The Brooklyn Elevated Railroad Company, of which the defendant Uhlman is receiver, was formed by the consolidation, and has succeeded to all the franchises, property, and rights of the Brooklyn Elevated Railroad Company, incorporated by chapter 585, Laws 1874, as amended, and the Union Elevated Railroad Company, duly organized under the rapid-transit act of 1875 (Laws 1875, c. 606), and is operating, by said receiver, an elevated railroad from the Brooklyn Bridge along and over certain streets to Flatbush avenue, and thence along and over that avenue, passing in front of the Flatbush avenue depot and yard of the Long Island Railroad Company, where it has an elevated station. The defendants the Long Island Railroad Company and Uhlman, as such receiver, are desirous of connecting the two roads, to the end that a traffic agreement theretofore entered into may be effectuated; and the Long Island Railroad Company has begun the construction of a viaduct from the said elevated structure on Flatbush avenue, in front of said depot and yard, through said yard, and along Atlantic avenue, over and above its tracks upon said railroad's right of way, crossing certain intersecting streets, and over Atlantic avenue, lying to the south of said strip, into its Carlton avenue freight yard, in which the surface or ground is reached by an incline, and thence over its tracks and connections, including the one so sought to be restrained, to and upon the aforesaid strip in the center of Atlantic avenue, and upon its main double-track road thereon. The highway commissioner of the city of New York, upon its application, granted permission to the Long Island Railroad Company to open Atlantic avenue (a) at Carlton avenue, for the laying of an additional connection between its said main line and said freight yard; and (b) also between South Oxford street and Ft. Greene place "for the purpose of building foundations for elevated railroad columns, in order to protect water mains of the city." It appears that the viaduct and its supports are to rest entirely on private property in the company's freight and depot yards, and within the line of the railroad property or strip on Atlantic avenue, except that at about Ft. Greene place, in supporting the turnout into the Flatbush avenue depot yard, because of a city water main "on a line practically under the northerly side of said right of way," and in compliance with the requirements of the municipal officers for the protection of said water

main from breakage or interference, foundations on steel beams over said main, in part outside of said right of way, but under the surface of Atlantic avenue, were constructed, the upright supports thereon for said viaduct being, when completed, within the line of said right of way, and the surface of Atlantic avenue and the intersecting streets remaining, as before the laying of said foundations, in no wise changed. It is also shown that the work contemplated and allowed under said permits has been completed.

The taxpayers' act (Laws 1892, c. 301) must, it is true, be liberally construed, for it is remedial in character. The official act complained of—the granting by the highway commissioner of the permits to open Atlantic avenue for the purposes stated—was not, however, an illegal act if the Long Island Railroad Company had the right to lay the additional turnout or connection between its said main line and its said freight yard, and had also, with the receiver of the Elevated Railroad Company, the right to join, to connect the two roads, and enter into a traffic agreement. The strip or right of way in question was granted by the then city of Brooklyn to the Brooklyn & Jamaica Railroad Company in exchange for a strip of land to the south thereof, now a part of said avenue, with the right to occupy and use the same for the purposes of railroad tracks and turnouts, in the operation of a railroad, in the same manner as on the land ceded to the city by said company, and which it owned in fee. The grant was to said railroad company "and its lessees, successors, and assigns." The right to construct turnouts is inherent to the charter of a railroad company; it is a necessary incident to the successful operation of a railroad. By its charter, the act for its incorporation, the Long Island Railroad Company obtained the right to construct a railroad, and "to maintain and continue a railroad or railroads, with a single or double track, and with such appendages as may be deemed necessary for the convenient use of the same." Laws 1834, c. 178, § 2. It owns a freight yard on the south side of the avenue, and it appears from the papers submitted that an additional turnout from its main line to its freight yard is necessary for the proper operation of its road, and that it has the right to lay the same cannot be assailed. People v. Brooklyn, F. & C. I. R. Co., supra. No question was raised on the argument of this motion, nor is any presented by the papers submitted, as to the right of either of the respective companies, the Long Island or the Brooklyn Elevated, to operate its road; in other words, no claim is made that any constitutional or statutory requirement prerequisite to the exercise of their respective franchises has not been complied with. By Laws 1874, c. 585, incorporating the Brooklyn Elevated, Silent, Safety Railway Company, afterwards changed to the Brooklyn Elevated Railway Company (Laws 1875, c. 422), that corporation was empowered "to construct, maintain and operate such turnouts  *  *  *  as may be necessary and proper for the successful maintenance and operation" of its railway; and by the rapid-transit act of 1875 (Laws 1875, c. 606), every corporation formed thereunder had power, among other things, "to  *  *  *  join and unite its railroad with any other railroad before constructed at any point on its route, and upon the grounds

58 N.Y.S.—24

of such other railroad company, with the necessary turnouts  * * * and other conveniences in furtherance of the objects of its connections." It is conceded that the Union Elevated Railroad Company and the present Brooklyn Elevated Railroad Company were organized under that act (Laws 1875, c. 606), and hence it necessarily follows that each took all the powers granted thereby. The foregoing provisions of the rapid-transit act were re-enacted and continued in section 4, subd. 5, of the railroad law (Laws 1890, c. 565), in the same language, excepting that in the latter the power conferred is "to  * * * join, or unite," disjunctive in form, while in the former the language was conjunctive. "To join," "to unite," "to connect" are synonymous terms, and may be used interchangeably in the consideration of this question. Such right so to connect, under that sec tion, may be granted and created by written agreement, and, if the corporations are unable to agree thereon, the right to necessary intersections and connections may be compulsorily enforced by proceedings under section 12 of the railroad law. As was said by Mr. Justice Wilmot M. Smith, in Kunz v. Railroad Co., 25 Misc. Rep. 335, 54 N. Y. Supp. 187: "That the companies have the right to make such connection is not open to serious question. Railroad Law, § 12; Buffalo, B. & L. R. Co. v. New York, L. E. & W. R. Co., 72 Hun, 583, 25 N. Y. Supp. 263. If the tracks of the two companies were lawfully constructed, the curve is a necessary incident thereto, and no further consent or authority is necessary for its construction." True, in that case, both were street-surface railroads, while here one is an elevated road. That fact, however, involves no serious objection, for the reason that the right is "to join  * * * upon the grounds" of the other company, which, it must be conceded, is the purpose and intention here. The two roads do not actually cross each other, but that is of no consequence, and affords no reason why they should not connect if they "are contiguous, or so near each other in  * * * cities that the public interests require that the roads should grant facilities for the interchange of cars, freight, and passengers." New York, L. & W. Ry. Co. v. Erie R. Co., 31 App. Div. 378, 52 N. Y. Supp. 318. In that case the connection was 200 feet in length, while here it is admittedly a much less distance from the elevated structure into the Long Island terminal yard at Flatbush avenue. For 60 years past it has been, and still is, "lawful  * * * for any railroad corporation to contract with any other railroad corporation" for the use of their respective roads, or any part thereof (Laws 1839, c. 218; Railroad Law, § 78), and such legislation has remained unaffected by the constitutional amendment of 1874 or the revised constitution, as adopted in 1895. That power and right has not been limited or changed in any wise by any subsequent legislation, and the power acquired thereunder so to contract is a property right, and a part of the franchise. Ingersoll v. Railroad Co., 157 N. Y. 453, 52 N. E. 545. The language is very comprehensive; it is, "any railroad corporation," and hence all are included.

Upon the passage of the act of 1839, the Long Island Railroad Company, theretofore incorporated, acquired such right. It at-

tached immediately to, and became a part of, its franchise, and upon the incorporation and organization of said elevated railroad companies each took as a part of its franchise, and, as one of its powers and rights, such power and right so to contract. The act of 1839 was in full force, and is in no wise inconsistent with the rapid-transit act. That they are in harmony I believe, and will endeavor to show. It may well be claimed that at the time of the enactment of chapter 218 of the Laws of 1839 elevated street railroads were not in contemplation, but that statute remains unchanged until its re-enactment and continuation in the railroad law of 1890. The rapid-transit act contemplated the construction of elevated street railroads in cities, and, among other things, provided that any corporation formed thereunder may "join and unite its railroad with any other railroad before constructed at any point on its route, and upon the grounds of such other railroad corporation." Section 26, subd. 3. If not for the purposes of a traffic agreement and the contract provided for by the act of 1839, why join at any point on its route or on the grounds of another railroad company? Can there be but one answer? Can it be said that it was not the legislative intent to give effect to the power conferred by the act of 1839, by permitting an elevated railroad company, organized under the act of 1875, to avail itself of the power and right so to contract? In my opinion, there is no question as to the power and right of an elevated railroad company, formed under that act (Laws 1875, c. 606), to so contract, and to enter into a traffic agreement with any other railroad company, in the manner provided by section 78 of the railroad law; and I am not unmindful that by subdivision 5 of said section 26 it was provided that "no such corporation shall have the right to acquire * * * the use or occupancy of any of the streets or avenues, except such as may have been designated for the route or routes of such railway," and that by section 129 of the railroad law it is provided that "no such corporation shall construct a street surface railroad to run in whole or in part upon the surface of any street or highway"; but such limitations clearly have no application to the questions under consideration.

There was no contention on the argument that the Long Island Railroad Company has not the same right to the use of the railroad strip or right of way on Atlantic avenue as its predecessor, the Brooklyn & Jamaica Railroad Company, had, and I see no room for any discussion on that point. The Brooklyn & Jamaica Railroad Company had the right to occupy and use the strip in question "for the purpose of railroad tracks and turnouts, to be used, traveled over, and employed by cars, carriages, and locomotives, and otherwise in the same manner as the railroad tracks on the said ceded strip of land"; that is, on the strip ceded to the city of Brooklyn. That the Long Island Railroad Company can, on what is its own right of way, construct a viaduct for the purpose of completing such connection with the Brooklyn Elevated Railroad, and to carry into effect said traffic agreement,—clearly railroad purposes,—cannot be seriously questioned. The opinion of Mr. Justice Cullen in the Beekman Case, 89 Hun, 15, 35 N. Y. Supp. 84, is, I think, conclusive upon that

proposition here; and, if the Long Island Railroad Company has the right to connect its main line on Atlantic avenue with its freight yard by a turnout upon the surface of the avenue, then there can be no question as to its right to connect that freight yard, by a viaduct over the same street, with its structure or viaduct upon said right of way, if it has the right to make and maintain such elevated connection with the elevated railroad company. The purpose of the elevated structure in the Beekman Case was identical with that in this case; that is, to connect a steam surface railroad with an elevated railroad structure and railroad.

The consent of the municipality, by its municipal assembly, under sections 72–74 of the charter of the city of New York is not a necessary prerequisite to the making of such connection or the construction of such viaduct, nor is it to the operation of the cars of one company upon the tracks of the other company, under a traffic agreement, for no new franchise is created thereby (Ingersoll v. Railroad Co., supra), and the right to use the tracks of another company is of a contractual character. It is the power to so contract that attaches to the franchise and is the property right. So it follows that title 1 of chapter 3 of the New York charter has no bearing upon this case, nor upon any of the questions presented. By section 524 of said charter the commissioner of highways has cognizance and control of the laying or relaying of railroad tracks in any public street, the form of rail used, character of foundation, method of construction, and the restoration of the surface of the streets after the doing of such work. There shall be no disturbance of the surface, except with his permission (section 525), hence a duty was cast upon him; but his permit creates no franchise, and cannot be construed as a consent by the city. By the granting of the permits complained of, the commissioner acted legally, and within his authority. From the foregoing it appears that there has been no injury to or waste of public property, that the granting of the permits by the highway commissioner was not an illegal, unlawful, or dishonest official act; and since, to quote the language of the late Mr. Justice Pratt, in the Beekman Case, supra, "it is common knowledge, too plain to require proof, or to be disputed, that the proposed connection will greatly add to the public convenience, and that it falls within the settled rule of policy of the state to permit railroads to connect for the convenience of the traveling public," plaintiff's motion must fail.

It is unnecessary to comment upon the Eldert Case, 28 App. Div. 451, 51 N. Y. Supp. 186, cited by plaintiff's counsel, further than to say that that case has no bearing upon this, for there the incline was in the center and upon the bed of a public highway, not, as here, upon private property and a railroad right of way. It was for some distance solid masonry; and plaintiff there, an abutting owner, sought its removal as a nuisance, not relief under the taxpayers' act. Plaintiff's motion is denied, and the temporary injunction dissolved.

Motion denied, and injunction dissolved.