DETERMINED IN THE

# THIRD DEPARTMENT

AT

# GENERAL TERM,

## September, 1887.

---

THE PEOPLE OF THE STATE OF NEW YORK *v.* JOHN
O'BRIEN, as Receiver of the Broadway Surface Railroad
Company, and Others.

*Power of the legislature to dissolve a corporation — effect of the dissolution upon the
property and franchises of the corporation — the rights of creditors and mortgagees
are not affected thereby — right of the legislature to substitute a receiver for the
directors, to wind up the affairs of the corporation — the legislature cannot restrict
a judge, in passing upon the validity of claims, to the evidence taken by the receiver
under a provision of the statute — chaps. 268, 271, 310 and 642 of 1886 — validity
and constitutionality of.*

After a corporation, organized under the general act providing for the construc-
tion, maintenance and operation of street surface railroads in cities, towns and
villages (chap. 252 of 1884), and known as the Broadway Surface Railroad
Company, had obtained the consent of the common council of the city of New
York and an order of the General Term confirming the report of commis-
sioners, who had recommended the construction of the road through that
street, and had complied with all the conditions attached to the said consents
it constructed and operated its road through the said street, and in so doing
issued bonds, secured by mortgages covering its road and franchises, and
entered into traffic contracts with other surface railroad companies, granting
them permissions to connect with and use its tracks upon the consideration
and subject to the conditions specified in the contracts. Thereafter, and
while the Broadway Surface Company was so operating the said road, an act
(chap. 268 of 1886) was passed by the legislature declaring "that the corpora-
tion called the Broadway Surface Railroad Company * * * be and the
same is hereby annulled and dissolved, and its charter is hereby repealed."

The act under which the company was incorporated subjected it to the provisions contained in section 8 of chapter 18, title 3 of part 1 of the Revised Statutes, which directs " that the *charter* of every corporation   *   *   *   shall be subject to alteration, suspension and repeal in the discretion of the legislature; " the corporation was also subject to those provisions contained in section 48 of chapter 140 of 1850, which provide that " the legislature may at any time annul or dissolve any *corporation* formed under this act."

*Held,* that the legislature had power to pass the act (chap. 268 of 1886) and that the same was constitutional and valid, and that by the passage thereof the Broadway Surface Company was dissolved and annulled and its charter repealed. (LEARNED, P. J., dissenting.)

Chapter 271 of 1886 provides that when any street surface railroad company shall have been dissolved, or annulled or its charter repealed by an act of the legislature, the consent of the owners of property and of the local authorities, and the orders of the General Term confirming the reports of commissioners in favor of constructing the roads, shall not be deemed to be in any way impaired and shall continue in full force, and that the right to the use and benefits of the said consents and orders, and to all the powers, privileges and benefits therein or thereby created, shall be sold at public auction by the municipal authorities within whose jurisdiction such railroad shall be.

*Held,* that as the company had complied with the conditions imposed by the common council and General Term, and had constructed and was operating its road, and had, as authorized by the statutes of the State, mortgaged its road and franchises, the act repealing its charter and dissolving the corporation did not destroy or impair the road and the franchise to maintain and operate the same which it had acquired, but that they passed as a legal estate charged with the mortgages and burdens legally placed thereon to the directors of the Broadway Surface Railroad Company, as trustees of the creditors and stockholders of the company, as provided by section 9 of 1 Revised Statutes (m. p. 600). That chapter 271 of 1886, so far as it provided for a sale of the consents of the city and property owners, was void.

Chapter 310 of 1886, entitled " An act to provide for the winding up of corporations which have been annulled and dissolved by legislative enactment," provides that " whenever any corporation organized under the laws of this State shall be annulled and dissolved by an act of the legislature, it shall be the duty of the attorney general immediately thereafter to bring a suit to wind up and finally settle and adjust the affairs of such dissolved corporation." It further provides (§ 3), that "it shall be the duty of the Special Term of the Supreme Court in the county designated in such summons and complaint, or of any judge of said court who resides in the judicial department in which such county is situated, upon the presentation of a certified copy of the act of the legislature annulling and dissolving a corporation, and of the summons and complaint founded thereon, immediately to appoint a receiver of the assets and property of such dissolved corporation," and that the person so appointed shall be both the temporary and permanent receiver thereof.

Under the provision of this act an order was made appointing the defendant John O'Brien receiver of the said company, upon the application of the attorney general, on the reading of the summons and complaint, and a verified copy of the act annulling and dissolving the company, without notice to or hearing any one on behalf of the company.

*Held*, that the act was valid; that the receiver took the place of the directors, and that the property of the company and the franchise to construct, maintain, operate and use it, were vested in him subject to the mortgages, contracts and conditions by which the same were bound at the instant of the dissolution of the company. (LEARNED, P. J., dissenting upon the ground that the act was unconstitutional in that it failed to require notice of the application for the appointment of a receiver to be given to the company or the directors.)

The distinction between franchises which are strictly the personal attributes of the corporation, and franchises which pertain to the uses to which its property is fitted, explained by LANDON, J., and the rule applicable to the latter stated to be that, to the extent that the Constitution and statutes have permitted the property franchises to be acquired by purchase instead of solely from the bounty of the State, the tenure depends upon the contract of purchase; and that, to the extent that the corporation has, under statutes authorizing it to do so, entered into contracts binding the property franchise, to that extent the personal quality of the franchise has been changed into an assignable quality and the life tenure into a tenure adequate to uphold such contracts.

The people, the plaintiff in this action, and the city of New York and the receiver, who were defendants, claimed that the traffic contracts made by the company were invalid, and sought to have them adjudged to be so in this action.

*Held*, that as the only persons who would be benefited by setting aside these traffic contracts would be the stockholders of the company, and they did not assail them, and none of the parties objecting claimed to act in their behalf, their validity could not be questioned by any of the parties in this action.

Section 5 of chapter 310 of 1886, after requiring the receiver to publish a notice to creditors to present their claims and demands against the dissolved corporation, authorizes him to examine, on oath, any of such creditors or claimants or other witnesses as to any or all matters pertaining to any claim or demand, or evidence of indebtedness presented, and makes it the duty of the court or judge to examine the list of the claims, together with such evidence as the receiver shall have taken, and to reject all claims, demands and evidences of indebtedness which were not legally incurred or created by said corporation, or which were in excess of its powers or which are for any reason shown to be illegal; and no claim or demand shall be allowed for any greater amount than the money value of the consideration therefor, unless the said court or judge shall find and decide *from the evidence taken by and before the receiver* that the claimant was a *bona fide* holder for value before the dissolution of the corporation.

*Held*, that this provision was unconstitutional as depriving persons of their property without due process of law. (Per LANDON, J.)

APPEAL by the plaintiffs and the receiver from so much of the judgment entered upon the trial of this action, brought before the court, without a jury, at the Albany Special Term, to wind up the affairs of the Broadway Surface Railroad Company, as adjudges and decrees that the company had, prior to the 4th day of May, 1886, the right to construct and perpetually maintain and operate a street surface railroad in lower Broadway; that the mortgages made by the Broadway Surface Railroad Company to the defendants, Hays and Palmer, were valid when made, and effectual to bind the said franchise to run a road, and that they were and are not affected by the termination of the life of the Broadway Surface Railroad Company, and are still valid and effectual liens upon the said right and franchise in favor of the holders of the bonds given under said mortgages; and that the contracts between the Broadway Surface Railroad Company and the Broadway and Seventh Avenue Railroad Company and the Twenty-third Street Railroad Company were within the power of these companies to make, and valid when made, and are not affected by the dissolution of the Broadway Surface Railroad Company; and that the assets of the said Broadway Surface Railroad Company in the hands of said John O'Brien, as receiver, are subject to the liens of the said mortgages and the burden of the said contracts, and that the franchise disposal act (chap. 271), passed May 4, 1886, is invalid and unconstitutional and void, and that that portion of the procedure act (chap. 310), passed May 11, 1886, which provides for proof of debts, is invalid, unconstitutional and void, and that the mayor, etc., of the city of New York be enjoined from proceeding under the said franchise disposal act.

The other appellants, namely, the defendants Sharp and McLean and others, as directors, and Bloodgood and Rhoades, appeal from so much of said judgment as adjudges and decrees that the Broadway Surface Railroad Company was dissolved and ceased to exist as a corporation, by virtue of the act of annullment, and that the appointment of the defendant John O'Brien as receiver in the action was valid and effectual, and that the assets and property of the said Broadway Surface Railroad vested in the receiver.

The Broadway Surface Railroad Company was a corporation organized under chapter 252 of the Laws of 1884, the general act providing for the construction, maintenance and operation of street surface railroads in cities, towns and villages. It obtained the consent of the common council of New York city to lay its tracks, etc, in Broadway in that city, and an order of the General Term confirming the report of commissioners, who had recommended the construction of the road through that street, and had complied with all the conditions attached to the said consents. It constructed and operated its road through Broadway and issued bonds, secured by mortgages, covering its road and franchises. It also entered into traffic contracts with other surface railroad companies, granting them permission to connect with and use its tracks upon considerations and subject to conditions specified in such contracts. Thereafter, and while it was so operating its road, chapter 268 of the Laws of 1886, was passed by the legislature of the State of New York, by which it was declared " that the corporation called the Broadway Surface Railroad Company, and purporting to have been organized as a corporation * * * for the purpose of constructing, maintaining and operating a surface railroad on Broadway in the city of New York, between the Battery and Fifteenth street, be and the same is hereby annulled and dissolved and its charter is hereby repealed." Chapter 271 of the same year was passed, providing for the sale of the franchises of corporations which should be dissolved by the legislature, and chapter 310 of the same year, contained provisions for the winding up of such corporations. Under this latter act, John O'Brien was appointed the receiver of the company upon the application of the attorney-general, on the reading of the summons and complaint and a verified copy of the act annulling and dissolving the company without notice to or hearing any one on behalf of the company.

*Denis O'Brien,* attorney-general, and *William A. Poste,* deputy attorney-general, for the people, appellants.

*Leslie W. Russell,* for O'Brien, receiver, appellant.

*Albert Stickney,* for Jacob Sharp, appellant.

*Thomas Allison,* for New York city, appellant.

*Stephen P. Nash*, for certain bondholders, appellants.

*Edward W. Paige*, for the Twenty-third Street Railroad Company, respondent.

*James C. Carter* and *Elihu Root*, for the Broadway and Seventh Avenue Railroad Company, respondent.

*William C. Gulliver*, for defendants McLean, Bird, Selmes, Pentz and Richmond, respondents.

LANDON, J.:

The corporation known as the Broadway Surface Railroad Company was organized under chapter 252, Laws of 1884. The corporation thus derived its charter mediately from the legislature, and as effectively as if it had been conferred immediately by a special act. The legislature which gave its consent could annex such conditions as it thought proper, provided it did not exceed legislative power. It had all legislative power not denied to it by the National or State Constitutions. It had the power to annul and dissolve the corporation and repeal its charter, irrespective of the State Constitution, if it had reserved the power. (*Dartmouth College Case*, 4 Wheat., 518.) The legislature had reserved the power in various ways, and, among others, in the precise form here exercised, namely, direct action upon the corporation and charter themselves.

Chapter 252 of the Laws of 1884 subjected the *charter* of this corporation to section 8 of chapter 18, title 3, of the first part of the Revised Statutes. That section provides that "the *charter* of every corporation that shall hereafter be granted by the legislature shall be subject to alteration, suspension and repeal in the discretion of the legislature." The *corporation* itself was also made subject to section 48 of chapter 140 of the Laws of 1850. This section provides that "the legislature may at any time annul or dissolve any corporation formed under this act." The act of 1884 also provided for its own alteration and repeal, but since the legislative power was not exercised in this form, this provision, as also section 1, article 8 of the State Constitution, providing that general laws and special acts relative to corporations "may be altered from time to time or repealed," need not be further considered than as

indicating the policy of the State to keep this and every other corporation under legislative control. Under the Constitution the legislature cannot abdicate this power, unless its permission given to corporations to make contracts which the National Constitution will preserve — of which hereafter — may be said to be *pro tanto* an abdication. The power of dissolution and repeal existing, the manner in which it may exercise this power can only be challenged by denying that it is legislative power. This denial has been substantially made in this case. As an academic question we might concede that the legislative power of repeal has reference to laws, and not to the creatures organized or formed under the laws; but this corporation cannot urge such an objection, since it took its existence subject to the condition that the legislature might exercise its legislative power in the form and manner here employed. We conclude that chapter 268 of the Laws of 1886 is constitutional, and that thereby the Broadway Surface Railroad Company was " dissolved and annulled and its charter repealed."

We assume that the Court of Appeals has decided that this action is properly brought. (*People* v. *O'Brien*, 103 N. Y., 657.) In order to determine the rights of the respective parties to this action, it is necessary to determine of what estate the Broadway Surface Company died siezed and possessed. To determine this we must ascertain by what tenure it held its property and franchises, and this requires us to examine not only its original tenure, but also whether such original tenure was augmented or qualified by its contract relations with other parties.

The repealing act by its terms limits its destructive force to the corporation and its charter. Its language is: " The corporation * * * is hereby annulled and dissolved, and its charter is hereby repealed." Both corporation and charter were annihilated co-instantaneously. Although two phrases are used in the act, one dissolving the corporation, and the other repealing the charter, each phrase is a sentence of death. While alive the corporation had its charter and all its property and franchises. Whatever power of alteration or forfeiture the legislature possessed, was never exercised during the life of the corporation. It died therefore in the fullness of its rights and acquisitions. Of course when the corporation was dissolved, its physical power to operate this railroad was destroyed;

the dead have no powers. Its franchise to be a corporation was destroyed; liberty to live cannot survive death. When the corporation was organized it was given life and endowed with faculties and .powers to act and acquire in defined lines of business. By the exercise of its powers it could acquire property rights. But it was empty handed. What it obtained afterwards in the line of its proper business was its acquisition, not part of itself, but as distinct from it as the owner is from the thing owned.

It died full handed, and its dead hands dropped their holdings charged with every lien and burden lawfully created, into the living hands appointed by law to receive them. The owner was taken away; the property owned was left. This property consisted of two kinds, corporeal and incorporeal. The corporeal was the railroad upon Broadway, already constructed in pursuance of the grant of that right and interest in the soil of the surface of the street, sufficient to enable the company to make the construction thereon. If that grant, standing alone, was of sufficient quantity to enable the company to maintain the railroad upon the street, then the grant of the interest in the soil granted both the right to construct and maintain. The construction was an executed act, the maintenance an act for the future. No law could defeat acts already accomplished, but could, it is conceivable, defeat the performance of contemplated future acts, if the power to defeat them inhered in the title granted to the company. But to maintain a railroad upon a public street would be a nuisance unless authorized by law. (*Fanning* v. *Osborne,* 102 N. Y., 441.) The right to maintain this constructed railroad was therefore a franchise. So, also, was the right to operate it.

By what tenure were these two kinds of property held by the railroad company at the date of its dissolution? At common law only for life, although since a corporation aggregate was deemed immortal the grant of real estate was equivalent to a fee, and, therefore, the law allowed it to be one. (2 Blk. Com , 109.) If a corporation had granted over its possessions to another before dissolution, they did not revert to the donor. (1 Rol., 816; Bac. Ab. Corp. J.) The franchises of a corporation, however, were the gift to it of a part of the sovereign's privileges, made upon considerations of personal trust and confidence and given by favor,

and hence ended upon its civil death. The basis of the doctrine of the life tenure of a franchise is the favor of the sovereign and personal trust and confidence in the incorporators. That a corporation may take its corporeal property by title absolute is not questioned by counsel, and is settled by authority. (*Yates* v. *Van De Bogert*, 56 N. Y., 526; *Nicoll* v. *N. Y. and Erie R. R. Co.*, 12 id., 121.)

Chapter 252, Laws of 1884, the statute under which this corporation was organized, conferred powers and privileges, among others as follows: "To hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter." (Pt. 1, chap. 18, tit. 3, § 1, R. S.) Also, "to purchase, hold and use all such real estate and other property as may be necessary for the construction and maintenance of its railroad and the stations and other accommodations necessary to accomplish the objects of its incorporation." (Chap. 140, Laws 1850, § 28, sub. 3.) Also, "to mortgage their corporate property and franchises to secure the payment of any debt," etc. (Id., sub. 10, as amended by chapter 133, Laws of 1880.) Also to "construct, maintain, operate, use and extend a railroad or branches on the surface of the soil" of Broadway, between designated *termini*, upon obtaining performance of certain conditions precedent, hereafter to be noticed. (Chap. 252, Laws, 1884, § 3.)

The term of its existence was to be one thousand years. The franchises of a corporation, which form part of its life and body, must, of course, be held upon a life tenure. The franchise to construct, maintain and operate this railroad was an acquisition subsequent to the creation of the corporation. We may grant that, upon the creation of the corporation, it was endowed with the power to construct, maintain and operate this or any other street surface railroad, provided it should first obtain the right to do so. The power was a physical or personal attribute or capacity, like any man's power, honestly to get what he lawfully may; but no right to the franchise was obtained until it was acquired as the fruits of the exercise of the power to get it. This corporation did exercise its powers, of acquisition, and did create and acquire this railroad, and therewith and as elements or qualities of this property, and so inseparable from it that they constitute its chief value,

acquired its usable and usufructuary capabilities or properties. The particular franchises acquired came with the acquisition of this particular property. The distinction between the franchises which are strictly the personal attributes of the corporation, and the franchises which pertain to the uses to which its railroad property is fitted, is well recognized. (See cases, hereafter cited, as to the assignability of such franchises.) The distinction is just. What sort of a government would that be which, after inducing its subjects to create a railroad, should then forbid its use?

The common law rule that the tenure of such a franchise is for the life of the corporation has been materially changed by our statutes, and in the case of street surface railroads by article 3, section 18, of the State Constitution. The rule, as we believe it to be, is, that to the extent that the Constitution and statutes have permitted the property franchises to be acquired by purchase instead of solely from the bounty of the State, the tenure depends upon the contract of purchase; and to the extent that the corporation has, under statutes authorizing it to do so, entered into contracts binding the property franchise, to that extent, the personal quality of the franchises has been changed into an assignable quality, and the life tenure into a tenure adequate to uphold such contracts. It may be conceded that to the extent that the property franchises have not been acquired or bound by contract, the common law tenure prevails.

The grant to this corporation of the interest in the surface of the soil of Broadway sufficient for the exercise of the right to construct, maintain and operate a railroad thereon, and also of the right itself, was initiated and completed in accordance with the provisions of chapter 252, Laws of 1884. This act was passed to carry into effect, among other conditions, the conditions provided by section 18, article 3, of the Constitution, adopted in 1875. This section provided that "no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of that portion of a street or highway upon which it is proposed to construct or operate such railroad, be first obtained." Prior to the adoption of this provision of the Constitution it had been settled

by the adjudications of the courts that the title to the land of the bed of the street was vested in the city in trust for the people of the State; that the adjoining owners had certain easements therein, but that the State had the right to authorize the construction of a railroad thereon without providing compensation either to the city or adjoining owners unless the owners would suffer some special injury. (*The People* v. *Kerr*, 27 N. Y., 188; *Kellinger* v. *Forty-second St.,* etc., *R. R. Co.*, 50 id., 206; *Milhau* v. *Sharp*, 27 id., 611.)

The constitutional provision of 1875, above referred to, placed important restraints upon the power of the legislature to authorize the construction of railroads upon the streets, and imposed conditions to enable the city and property owners to protect their own interests against the improvidence of the State, or the rapacity of the railroad company. The grant of the franchise originates with the State as before, but power of the State to complete its grant, so as to vest it in the possession and enjoyment of the grantee, is made dependent upon the consent of the city and of the property owners; until this consent be given the grant is only inchoate, a mere tender upon conditions, and the conditions may never be performed by the city and property owners, or the grant be accepted by the grantee. The city and the property owners are thus brought in as parties whose consent is necessary. Some of the terms which the city may impose, as the price of its consent, are prescribed in chapter 252, Laws 1884. Section 7 provides that : "The local authorities of any incorporated city or village, to whom application under the provisions of this act may be made for consent to the construction, maintenance, use, operation or extension of a street surface railroad upon any street, * * * may, at their option, provide for the sale of, and sell at public auction the franchise, subject to all the provisions of this act." Thus the legislature expressly makes the franchise purchasable property. It may be observed that a franchise, purchasable in the first instance at public auction, is obtainable upon other considerations than the gracious favor of the sovereign and special personal confidence and trust in the grantee, which form the basis of a tenure for life.

The State, therefore, may not vest its grant of the franchise in the grantee except in pursuance of the terms of such contract conditions

as the city and grantee enter into, and to which the State has pledged its consent in advance. The interest in the land on the surface of the street, and the franchise to construct, maintain and operate the railroad thereon, all pass together to the grantee, upon the completed execution of the grant by all the grantors, and its acceptance by the grantee. The contract between the city and the grantee, to which the State is also a consenting party, is thus authorized by the State Constitution, and the National Constitution forbids the State to impair its obligations. (U. S. Const., art. 1, § 10.) The consent of the property owners may also be based upon contract equally inviolable.

It follows that the tenure of the grant of the interest in the real estate of the street and of the franchise, must be adequate to uphold the contracts upon which the consents were obtained, and also be of the extent expressed in such contracts. It is objected that such construction practically defeats the intention of the legislature in dissolving the corporation. That intention must, of course, be controlled by the constitutional protection of contract obligations. Neither public nor private interests are supposed to be promoted by the destruction of valuable property, and no person or corporation can be deprived of vested rights in property except upon due process of law. When the Constitution made the vesting of this franchise dependent upon the execution of a contract between the city and the company, it allowed the franchise to become the subject-matter of the contract, and the consideration upon which it was entered into; and since the subject-matter and consideration cannot be withdrawn from the obligations of the contract without impairing those obligations, the Constitution places it beyond the power of the State, without the consent of both city and company, to withdraw this franchise. Its reserved power was limited to the destruction of the powers it gave to the company as a part of its life and being, and to the regulation of those powers and the property rights the company acquired by their exercise, and did not extend to the destruction of such rights.

The power of the legislature to resume, by right of eminent domain for public purposes, such property rights, upon making just compensation, may also be conceded. (Sixth Av. R. R. Co. v. Kerr, 72 N. Y., 330.) If the State also retains the power to impair

its own contract with the company in its part of the grant, it does not reserve the power to impair the contract of the city and company, and since in this case one contract cannot be impaired without impairing the other, neither can be. (*Commonwealth* v. *Essex Co.*, 13 Gray, 239.) Plainly property rights acquired by the corporation by the exercise of its corporate powers are vested rights, and the contract with parties other than the State, whereby they were lawfully secured, are within the protection of the National Constitution.

The consent of the city was given by its common council to the Broadway Surface Railroad Company upon the agreement of the company, secured by an adequate bond, to pay the city $40,000 per year by way of rent, also three per cent upon its earnings for the first five years and five per cent per year thereafter, and to do and perform certain other things burdensome to the company and beneficial to the city. The consent was "to construct, maintain, operate and use a street surface railroad for public use in the conveyance of persons in cars" on Broadway, between designated *termini.* This consent was formally accepted by the company. No term of time is expressed in the consent. For five years three per cent per year of the earnings must be paid, and five per cent per year thereafter, thus indicating an indefinite length of time after five years. The consent is given upon condition that the provisions of chapter 252, Laws of 1884, shall be complied with, and also upon the condition that if the company should fail to pay the percentages, the provisions of the act providing for a forfeiture of the franchise upon judgment in a suit to be brought by the attorney general should be applicable. This consent and acceptance constitute a contract.

Prior to the adoption of the constitutional amendment of 1875, the effect of such a contract, substantially, as was here entered into between the company and the city, provided there were the constitutional and legislative power to make it, had been frequently discussed by the courts, and the substance and effect of the decisions were, that thereby a grant, both of an irrevocable property interest in the street and of the franchise to construct, maintain and operate the railroad and take tolls thereon, would be made. (*Milhau* v. *Sharp*, 27 N. Y., 611; *The Mayor, etc.,* v. *The Second Ave. R. R.*

*Co.*, 32 id., 261; *Davis* v. *The Mayor, etc.*, 14 id., 506, 532; *The People* v. *Sturtevant*, 9 id., 263, 273; *The Brooklyn Central R. R. Co.* v. *The Brooklyn City R. R. Co.*, 32 Barb., 358, 364; *State of New York* v. *The Mayor, etc.*, 3 Duer, 119.) The real estate and franchise granted would be property subject to condemnation for public use (*Sixth Ave. R. R. Co.* v. *Kerr*, 72 N. Y., 330), not personal merely to the railroad company, but assignable (*The People* v. *Brooklyn, F. and C. I. R. Co.*, 89 N. Y., 75; *Metz* v. *Buffalo, Corry and P. R. R. Co.*, 58 id., 61; *New Orleans R. R. Co.* v. *Delamore*, 114 U. S., 501; *Morgan* v. *Louisiana*, 93 id., 217; *R. R. Co.* v. *James*, 6 Wall., 750; *Memphis R. R. Co.* v. *Comrs.*, 112 U. S., 609; *Greenwood* v. *Freight Co.*, 105 id., 13 *Covington DrawBridge Co.* v. *Shepherd*, 21 How. [U. S.] 112; *Hall* v. *Sullivan R. R. Co.*, 21 Law. Rep., 138); and, independently of the constitutional provision of 1875, binding upon the State so far as the interest in real estate is concerned. (*Beekman* v. *S. and S. R. R. Co.*, 3 Paige, 45, 72; *Danolds* v. *State*, 89 N. Y., 36; *Fletcher* v. *Peck*, 6 Cranch, 87.)

The Constitution of 1875 having authorized both grant of real estate and franchise, both became bound by the terms and tenure of the grant; and, as was said in *Milhau* v. *Sharp*, perpetually bound, " because there is no limitation in point of time to the continuance of the franchise, and no direct power is reserved to the corporation (city) to terminate it," except, we may add, with reference to the present case, the right of forfeiture upon the happening of the condition subsequent, namely, the non-payment of the annual rents or dues, or the non-performance of the conditions prescribed by chapter 252, Laws of 1884, and by the contract, none of which defaults have occurred. It was contemplated by all the parties to the grant that the company should hold its property and the franchises granted with it so long as it should continue to perform its contract and statutory obligations, subject also to further statutory regulations; and such is the tenure by which, at its dissolution, the company did hold them.

Independently of the peculiar features of a grant of property franchise to street surface railroads impressed upon the grant by the constitutional provision of 1875, such franchises, as the cases above cited, touching their assignability, show, have the same assignability

as the franchises of other railroad companies. This proceeds from the act authorizing the incorporation, and the statute referred to therein, already quoted, authorizing the company to mortgage its franchises. The statute which authorizes the mortgage of the franchises imports a tenure adequate to uphold the mortgage. Under this statutory authority this railroad and its franchises were mortgaged for large sums of money. Upon default in payment of the mortgage, the franchises and property could be sold. Several acts provide methods to enable the purchaser to take the proper steps to enjoy the property and franchises thus sold and purchased. (Chap. 282, Laws 1854; chap. 444, Laws 1857; chap. 469, Laws 1873; chap. 710, Laws 1873; chap. 430, Laws 1874; chap. 446, Laws 1876; chap. 113, Laws 1880.) They may not be strictly applicable to a street surface railroad, but they indicate the policy of the State to be, to make railroad property and franchises as available in the hands of the purchaser, as in the hands of the first holder, and to give them that assignable quality, so essential to private enterprise and the usefulness of railroads. Even if the purchaser cannot himself use the franchise he may hold it until he finds a purchaser endowed with the capacity of using it, as was done in the case of *The People* v. *Brooklyn, Flatbush and Coney Island Railroad Company* (89 N. Y., 75).

The fifteenth section of chapter 252, Laws 1884, expressly provides for the lease or transfer, by one street railroad company to another duly authorized, of the right to run upon, or use any portion of the street railroad tracks. This implies the assignability of the franchise, to the extent necessary to uphold such lease or transfer.

Section 48 of chapter 140, Laws of 1850, which, as we have seen, is the only statute which in terms authorizes the legislature "to annul or dissolve any incorporation formed *under*" the act, as distinguished from *by* the act itself, has this saving clause: " But such dissolution shall not take away or impair any remedy given against any such corporation, its stockholders or officers, for any liability which shall have been previously incurred." Thus, this act permits the incorporation (*i. e.*, the associating together of the elements whose union completes the corporation), to be dissolved and annulled, but saves remedies. If the remedy is to enforce the contract which

binds the property franchise, such franchise must survive and be preserved.

We are cited by counsel to many authorites, in which the effect of a repeal or amendment of the statute under which the corporation was formed has been considered. We concede that the corporation takes both property and property franchises subject to proper legislative regulation. The liability to such regulation is in effect written in the charter to the extent of the power reserved. (*People ex rel. Kimball* v. *The B. and A. R. R. Co.*, 70 N. Y., 569.) When the liability ripens into an actuality, theoretically and logically no wrong has been done to the corporation, or any one dealing with it, for all dealt subject to the hazard, and consenting to abide its consequence. (*Penn. College Cases*, 13 Wall., 190.) Thus, where lands are granted upon condition of forfeiture upon condition subsequent, the vice of this liability taints the title and may destroy it. A mortgage upon such a title abides the fate of the title. (*Silliman* v. *F. O. and C. R. R. Co.*, 27 Gratt., 119.) In the case at bar the statute which authorized the mortgages removed the vice of a life tenure.

In the *Sinking Fund Cases* (99 U. S., 700), Chief Justice WAITE says (p. 721): "Whatever rules congress might have prescribed in the original charter for the government of the corporation in the administration of its affairs, it retained the power to establish by amendment. In so doing it cannot undo what has already been done; and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into. It might originally have prohibited the borrowing of money on mortgage, or it might have said that no bonded debt should be created without ample provision by sinking fund to meet it at maturity. Not having done so at first it cannot now, by direct legislation, vacate mortgages already made under the powers originally granted, nor release debts already contracted."

In *New Orleans, etc., Railroad* v. *Delamore* (114 U. S., 501) the court said (p. 510): "Where there has been a judicial sale of railroad property under a mortgage authorized by law covering its franchises, it is now well settled that the franchises necessary to the use and enjoyment of the railroad passed to the purchasers."

It is urged by the learned counsel for the people that the force of this decision is broken, so far as the case at bar is concerned, by the fact that the franchise had yet twenty-one years to run, and was, by the laws of the State, assignable and the mortgagor company was still alive. The material fact, however, was that the mortgage was authorized by law. That fact eliminated the personal quality and personal tenure to the extent necessary to uphold the mortgage. The courts, impressed by a sense of the unnecessary evils which may by possibility flow from this exercise of reserved legislative power, say that it has its limits. (*Sinking Fund Cases*, 99 U. S., 700; *Holyoke Co.* v. *Lyman*, 15 Wall., 500; *Miller* v. *The State*, Id., 478; *Shields* v. *Ohio*, 95 U. S., 319; *Commonwealth* v. *Essex Co.*, 13 Gray, 239.) And these cases agree that vested rights cannot be impaired.

The case of *Greenwood* v. *The Freight Company* (105 U. S., 13) is much relied upon by the attorney-general. It arose under the law of Massachusetts, which authorized the amendment, alteration or repeal of an act of incorporation at the pleasure of the legislature. The court said : " What is the effect of the repeal of a charter of a corporation like this? * * * If the corporation be a bank, with power to lend money and to issue circulating notes, it can make no new loan nor issue any new notes designed to circulate as money. If the essence of the grant of the charter be to operate a railroad, and to use the streets of the city for that purpose, it can no longer so use the streets of the city, and no longer exercise the franchise of running a railroad in the city. In short, whatever power is dependent solely upon the grant of the charter, and which could not be exercised by unincorporated private persons under the general laws of the State, is abrogated by the repeal of the law which granted these special rights. Personal and real property acquired by the corporation during its lawful existence, rights of contract or choses in action so acquired, and which do not in their nature depend upon the general powers conferred by the charter, are not destroyed by such a repeal." ·

Had the case arisen in New York instead of Massachusetts the court would probably, under the authority of *People* v. *The Brooklyn, Flatbush and Coney Island Railway Company* (89 N. Y., 75), have conformed its language to our law, which allows unincorpor-

ated private persons to hold such franchises until they can organize or sell to an incorporated company qualified to exercise them. So qualified, the case supports the views here presented. *Erie and New England Railroad Company* v. *Casey* (26 Penn. St., 287) is also cited by the attorney-general. In that case a railroad charter had been repealed, and the court used the following language in regard to the right to run the cars and take tolls therefor: " When the lands were taken to build it on they were taken for the public use, otherwise they could not have been taken at all. It is true the plaintiffs had a right to take tolls from all who traveled or carried freight on it, according to certain rates f xed in the charter, but that was a mere fianchise, a privilege derived entirely from the charter, and it was gone when the charter was repealed. The State may grant to a corporation or to an individual the franchise of taking tolls on any highway, opened or to be opened, whether it be a railroad or river, canal or bridge, turnpike or common road. When the franchise ceases by its own limitation, by forfeiture or repeal, the highway is thrown back on the hands of the State, and it becomes her duty, as a sovereign guardian of the public rights and interests, to take care of it. She may renew the franchise, give it to some other person, exercise it herself or declare the highway open and free to all the people." We understand that the common law rule which we have considered above prevailed in Pennsylvania. The rule is correctly stated according to the common law. Besides the charter contained the provision that the State, upon abuse or misuse of its privileges by the company, might resume them.

We need not continue this part of the examination further. It follows from what we have said that, upon the dissolution of the corporation, the railroad and the franchise to maintain, construct and operate it were not destroyed or impaired, but passed as a legal estate, charged with the mortgages and burdens legally placed thereon, to the directors of the Broadway Surface Railroad Company, as trustees of the creditors and stockholders of the company. (1 R. S., m. p. 600, § 9.) The act (chap. 310, Laws of 1886) provided for transferring this trust from the directors to the receiver. The Revised Statutes (sec. 9), above cited, places such trust in the directors unless " other persons shall be appointed by the legisla-

ture or by some court of competent authority." Chapter 310, Laws of 1886, was passed seven days after the repealing act. Under its provisions the receiver was regularly appointed by a court of competent authority, and we are not advised of any motion to vacate the appointment. The substitution of one trustee for another, where the trustees have no beneficial interest and are merely representatives of creditors and stockholders, does not affect any vested rights of the real parties in interest, but simply changes the agents through whom such vested rights are to be protected and administered There is no doubt that the legislature intended chapter 310 to apply to this case. We think the receiver took the place of the directors, and holds in their stead by a valid title.

The property of the Broadway Surface Railroad Company and franchise to construct, maintain, operate and use it, if the foregoing views are correct, are now vested in the receiver, subject to the mortgages, contracts and conditions by which the same were bound at the instant of the dissolution of the company. Since none of these were impaired in their lien upon the property and franchise, it follows that they are as valid against the receiver as they were against the company. If the company could not defend against the mortgages, the receiver cannot. If the company could not defend against the traffic contracts, the receiver cannot. If the company acquired the benefit of the contracts and orders, whereby the consents of the city and property owners were vested in the company, the same benefit is vested in the receiver for the benefit of the stockholders and creditors. No legislation could validly impose upon or vest in the receiver the right or power to divest this estate of any of its rights or property and bestow them, or any of them, upon the city or State, except upon just compensation. The statute (chap. 271, Laws of 1886), so far as it provides for the sale of the consents of the city and property owners, is, therefore, void.

With respect to the traffic contracts, they cannot be declared void in this action. None of the parties assert their invalidity except the city, the people and the receiver. The act for the disposal of the consents being declared unconstitutional, the city practically passes out of the case until some default shall be made by the receiver in paying the rent or performing the conditions of the contract. The people do not bring an action to set aside an

alienation of property made by one or more officers of a corporation contrary to a provision of law, or for a purpose foreign to the lawful business and objects of the corporation. (Code Civ. Pro., § 1781, sub. 5.) Such an action implies the existence of the corporation, and is for the benefit of its stockholders. Nor is it brought to compel the operating companies to answer by what right they are exercising the franchise to operate the Broadway Surface Railroad. Such an action would be triable by jury. (Code Civ. Pro., § 1950.) But the action is brought to wind up the affairs of the dissolved corporation. The rights of the parties are to be determined by the law by which they were vested, and without any substantial prejudice from any subsequent change of the remedies by which they are to be enforced. (*McCracken* v. *Hayward*, 2 How. [U. S.] 608, 612; *Poindexter* v. *Greenhow*, 114 U. S., 270.)

The people are the parties plaintiff, whereby the real parties in interest are brought into court. The receiver in the contest with the operating companies stands in the place of the Broadway Surface Railroad Company. If the latter company had sought the aid of a court of equity to set aside the traffic contracts as *ultra vires*, or irregularly executed, several defenses would have been open to the traffic companies. (*Whitney Arms Co.* v. *Barlow*, 63 N. Y., 62; *Greenpoint Sugar Co.* v. *Whitan*, 69 id., 328; *Bissell* v. *The Michigan S. and N. I. R. R. Cos.*, 22 id., 258.)

It is probable that a tender of the restoration of benefits received from, and a rescission of the obligations entered into by, the traffic companies for the benefit of the Broadway Surface Company, would have been a condition precedent to any substantial relief. We are not advised by the complaint that it is desired upon such terms. If the views we have presented are correct the only persons to be benefited by setting aside the traffic contracts are the stockholders, and we do not understand them to ask it, or the people to ask it in their behalf. The real purpose of setting aside such contracts is understood to have been for the benefit of the city upon the resale of the consents.

We do not pass upon the question whether the act (chap. 218, Laws of 1839) was repealed by chapter 252, Laws of 1884, so far as street surface railroad companies are concerned, or whether under

any other acts the traffic contracts were authorized. We do not think the parties are in a position to raise the question in this action. We therefore, in this respect, affirm the judgment of the court below without prejudice, if the attorney general so desire it, to any other action which he may be advised to institute to test the question.

Some of the sections of the winding up act (chap. 310, Laws of 1886) are unconstitutional. Section 5, after requiring the receiver to publish a notice to creditors to present their claims and demands against the dissolved corporation, proceeds: "Such receiver is hereby authorized to examine, on oath, any of such creditors or claimants, or other witnesses, as to any and all matters pertaining to any claim or demand, or evidence of indebtedness, so presented."

The evidence is to be filed by him, and the act then makes it the duty of the court or judge to examine the list of claims, "together with such evidence as the receiver shall have taken, and to reject all claims, demands and evidences of indebtedness which were not legally incurred or created by said corporation, or which were in excess of its powers, or which are for any reason shown to be illegal, and no claim or demand shall be allowed for any greater amount than the *money value* of the *consideration* therefor, unless the said court or judge shall find and decide *from the evidence taken by and before the receiver*" that the claimant was a *bona fide* holder for value before the dissolution of the corporation. This makes the receiver the judicial officer to take the testimony, and does not permit any evidence to be taken by any disinterested officer, it does not permit the judge to decide according to the very right of the matter, but instructs him to decide so as to promote a scheme of spoliation. The legislature can prescribe modes of procedure and define the rights of parties within constitutional limits with respect to future transactions. It can change remedies and procedure with respect to past transactions so long as it does not impair vested rights. No man shall be deprived of his property without due process of law. When the transactions have already occurred by which rights and property are vested, any legislative attempt to divest them by closing the ear of the court to all evidence except such as a party, possibly biased and adverse, may permit to be

heard, and by directing in advance the decision the court shall thereupon render, is condemned alike by the Constitution and by every sentiment of justice. We concur with the trial court in holding these provisions unconstitutional.

The judgment is in all things affirmed, with costs against the plaintiff in favor of the respondents who have not also appealed, but without prejudice to any action the attorney-general may bring respecting the traffic contracts.

BOCKES, J., concurred in the conclusion; LEARNED, P. J., concurred, except as stated in opinion below.

LEARNED, P. J. (dissenting):

We are asked in this case to decide that a law dissolving the Broadway Surface Railroad Company is constitutional, and to distribute the property of the company, when the very company which is said to have been dissolved and which has the most direct interest in the question is not a party to the action, and therefore cannot be bound by the decision. But it is said that the receiver represents the company. If that be so, a still greater injustice has been perpetrated. For the receiver was appointed without any notice to, or hearing of, the company.

The act (chap. 268, Laws of 1886), purporting to annul and dissolve this existing corporation and to repeal its charter, was one which, if valid, affected vested and very valuable rights. It would therefore be only according to due process of law (now guaranteed by the fourteenth amendment to the Constitution of the United States), that this corporation should have a judicial hearing and decision before its vested rights were taken away. But by chapter 310 of the same year it was provided that on the presentation of a certified copy of an act annulling and dissolving the corporation and of a summons and complaint founded thereon by the attorney-general to a Special Term of the Supreme Court, or a judge thereof, the court or judge should immediately appoint a receiver of the assets and property of such dissolved corporation. No provision is made for any notice to the corporation, or to any of its stockholders. No opportunity is given for the corporation or the stockholders to show that the act of dissolution is void. No requirement is made

that the complaint shall state any facts. No obligation is placed on the court or judge to inquire into any facts. So far as his exercise of any judgment is concerned, a newspaper would be as good as the summons and complaint. For it is made his duty on the presentation of this summons, and complaint immediately to appoint a receiver.

As has been well said, "any legislative attempt to divest (vested rights), by closing the ear of the court, to all evidence excepting such as a party possibly biased and adverse may permit to be heard and by directing in advance, the decision the court shall thereupon render is condemned alike by the Constitution and by every sentiment of justice." And so, if we examine the order appointing a receiver in this case, we shall find that it was granted on reading the summons and complaint and a verified copy of the act and on the motion of the attorney-general without notice to, or hearing any one for, the company. Indeed, the complaint was dated and verified May fourteenth, and the order appointing a receiver was made that same day, so that notice was practically impossible.

Now, one of the most important questions here is, whether the legislature can pass an act (valid or void is of no consequence), which shall purport to annul a corporation, and then can require the court, at the request of the attorney-general, without notice to any one, to transfer to some person selected by him, all the property of this corporation which, for all that has been decided, is as valid a corporation as it ever was.

It does not help the matter to call this person to whom the property of the corporation is, without notice, transferred by the legislature "a receiver." It is no less the taking of property from the owner, the corporation, and giving it to another. It is to guard against such transactions that Constitutions have so often said that a person shall not be deprived of property without due process of law, or by the law of the land. And, repeatedly, it has been decided that a mere legislative enactment is not due process of law, and is not, in this sense, the law of the land. If it were, then (and this case illustrates the remark), "judges would sit to execute legislative judgments and decrees, and not to declare the law or administer the justice of the country." That is what has been done here. The learned justice who granted the order

appointing a receiver, only executed a legislative judgment and decree, and the person whose property was taken from it was not permitted to be heard, and has never been heard, even through all this heavy litigation. " A law which, by its own inherent force, extinguishes rights of property or compels their ext: tion, without any legal process whatever, comes directly in conflic ith the Con stitution." ( *Wynehamer* v. *People*, 13 N. Y., 434.)

The property of a corporation is no more at the merc, of a legislature than that of a natural person, and no legislature could make it the duty of a court, on the application of the attorney general and without any notice to a natural person, to appoint a receiver, who should take immediate possession of the person's whole property. If it be said that the company had, by chapter 268 of the Laws of 1886, become defunct, and, therefore, that there was no one to whom notice could be given, that is to assume the very question on which we are to decide. If that act was unconstitutional, then the company was not defunct. To say that the company is defunct and, therefore, entitled to no notice, and then, without giving it notice, to decide that it is defunct, is like hanging a man first and trying him afterwards.

But, further, that act was passed May 4, 1886. If it was constitutional and the company thereby ceased to exist, then by 1 Revised Statutes (m. p. 600, § 9) the directors became at once trustees for the stockholders, and had full power to settle up the affairs of the company. So that when chapter 310 of that year was passed, May eleventh, if the company had been lawfully annulled, the directors were by law the trustees, and were entitled as such to the ownership and possession of the property. How could the legislature, by its mere act, require the court, without notice to these trustees, to take from them property with which they were vested by law?

Of course there are cases of non-residents having property in this State in which judicial process goes against the property, and notice is given to such non-resident by advertisement and the like. And there are cases of distributions of property and estates where notice is given otherwise than personally, so that there are exceptions to the general rule requiring personal notice of judicial proceedings. But in the case of a citizen of this State, or a corporation in this State, incorporated by its laws and having its property here,

I cannot believe that property can be taken from it by the form of a judicial proceeding of which the owner of the property has no notice, and to which such owner has no opportunity to make a defense.

When this order of May fourteenth was made, either the corporation was, or, if that was defunct, its trustees were, in possession and entitled to the ownership of the property which had belonged to the company. On that day an order of the court, without notice to these owners, assumed to take away their property and give it to another person. I do not believe that this is by "the law of the land" (Const., art. 1, § 1), or by "due process of law" (art. 1, § 6). "The words 'due process of law' * * * cannot mean less than a prosecution or suit instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining the title to property." (*Taylor* v. *Porter*, 4 Hill, 147.) It is no process of law at all when a court, without giving the owner a hearing, takes away his property. Nor do I think that this constitutional principle can be evaded by arguing that the receiver is but a temporary custodian. Every owner of property has a right to be custodian of his property, unless upon a hearing it be decided that such right must temporarily cease. To take from him the possession of his property is *pro tanto* as much depriving him of his rights as to take away the absolute ownership. And if possession is ordinarily nine-tenths of the law, the possession of a receiver of a railroad company, with his (supposed) power to issue certificates and his rights to fees, is fully ten-tenths. Furthermore, this receivership is no temporary control. As will be seen by section 6 of chapter 310, it is but a step to the sale of the property — an absolute transfer of the company to the highest bidder.

I do not see that any of the parties to this present action were really interested to have the annulling act declared unconstitutional. Certainly not the plaintiff : nor the receiver, who claims under that act ; nor the directors who are said to claim to be trustees because the company is annulled. The remaining parties seem only to desire to protect their own interests as mortgagees, lessees and the like, whatever became of the company. It is, therefore, not strange that the repealing act was held constitutional in the judgment now appealed from.

In the case of *Chicago Life Insurance Company* v. *Needles* (113 U. S., 574) a question arose as to the validity of a judgment dissolving a corporation in an action commenced by the auditor of the State, and the court, in affirming its constitutionality (at p. 583), said : There is no " deprivation of property without due process of law, for that statute authorizes a public officer to bring the company before a judicial tribunal which, after full opportunity for defense, may determine whether it is insolvent," etc , "grounds which, if established, constitute sufficient reason why the corporate franchises and privileges granted by the State should be no longer enjoyed."

Now, these remarks show what, in the opinion of that court, was necessary to constitute due process of law, viz., bringing the company before the tribunal, full opportunity for defense, determination of the facts by the court. Not one of these existed to authorize the order appointing a receiver.

In *Stuart* v. *Palmer* (74 N. Y., 184) the court say "that due process of law requires an orderly proceeding adapted to the nature of the case in which the citizen has an opportunity to be heard and to defend, enforce and protect his rights. A hearing, or an opportunity to be heard, is absolutely essential. We cannot conceive of due process of law without this." These admirable words should never be disregarded.

Thus it was also said in another case : " He is sought to be held bound by a judgment when he was never personally summoned or had notice of the proceeding, which result has been frequently declared to be contrary to the first principles of justice." (*Ferguson* v. *Crawford*, 70 N. Y., at 256.)

But if, without hearing the company, we are to pass upon the question of the validity of the annulling act, I am not ready to hold it valid. The right to be a corporation is simply the right of several natural persons to associate and act as an artificial person. In regard to all that class known as moneyed corporations there is no doubt that the property, to which the corporation has the legal title belongs beneficially to the stockholders, and their beneficial right does not cease when the corporation ceases to exist. They still remain the beneficial owners.

The old idea that the right to be a corporation was a franchise or

special gift of the legislature is modified by the Constitution, which provides that corporations shall not be created by special acts, except when, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. (Const., art. 8, § 1.) The legislature has passed general laws under which this railroad company and others like it may be incorporated, and has thus declared that the objects of this corporation can be attained under general laws. And the legislature has passed numerous laws under which corporations of various kinds may be created. So that, in fact, it is easier to form a corporation than to form a limited partnership. There is, then, no longer a special privilege but a general right.

Under these general laws numerous corporations have been formed; and the agreements forming such corporations are contracts which the parties thereto have entered into with each other. They are as much contracts between the parties as a limited partnership is. Would it be thought that the legislature could dissolve and annul a contract of limited partnership? Further, when the right to be a corporation was a special gift of the legislature, if the legislature took away its gift, there could no longer be a corporation. But now, if five persons incorporate themselves to-day under a general law, and if to-morrow the legislature pass an act dissolving the corporation, the same five persons may, the day after, incorporate themselves again under the same name and for the same purpose. What sense, then, in saying that the legislature may annul a contract of incorporation, when the parties to it may, under these general laws, form the same contract again and become the same corporation as before?

It is in accordance with these views that the Constitution, in that same section, provided that all general laws and special acts passed pursuant thereto might be altered from time to time or repealed. It made no provision for the alteration or repeal of a corporation formed under a general law. The alteration or repeal contemplated was of a law, not of a private contract made under a law, and the alteration or repeal of a general law is not the same as the alteration or repeal of a contract made under such law. Nor does the law now in question repeal a general law. As the Constitution, therefore, does not authorize the annulling of a contract of incorpo-

ration made under the general law, we may take its language as by implication denying such power. Nor does section 8, chapter 18, title 3, part 1 of the Revised Statutes apply, because, that speaks of charters conferred by the legislature. This corporation has not a charter conferred by the legislature. The legislature conferred nothing; and are forbidden to confer such charters.

It is said that by section 48, chapter 140, Laws of 1850, the legislature has this right to dissolve this corporation. If by enacting a law that every contract thereafter made by any persons may be thereafter annulled by the legislature, the effect of the provision of the United States Constitution as to the validity of contracts can be destroyed, then that argument is sound; and that constitutional provision is practically annulled. The legislature claims to annul this contract, made under a general law, because it had declared that it might do so. Suppose the legislature should enact that every promissory note thereafter made should be subject to be annulled by the legislature. Would such notes be affected thereby? As said above, the existence of general laws for incorporation is inconsistent with the idea that corporations formed under these laws may be annulled by the legislature. Such corporations are really but private contracts which the legislature may not destroy. When the power to incorporate is thus general, the so-called repeal of the charter can have no other effect than to put the property, beneficially belonging to the corporators, into the hands of the directors as trustee for the corporators. These corporators may again incorporate themselves, and as soon as the directors (as trustees), have closed up the business of the former corporation, may put the same property again into the new corporation. That great harm and embarrassment might thus be effected by the legislature is undoubtedly true. But it is difficult to see how any taking away of the right to be a corporation could be effectual.

It is not necessary to inquire whether a repeal of the general law would destroy corporations created before the repeal, for no such repeal has been attempted. It is doubtful whether a corporation incorporated under the general laws has anything which can be called a charter, although that word is often used in respect to such corporations. But, if applied to the certificate signed by the parties and filed, it is quite inaccurate, for that is simply a pri-

vate agreement, not in any way a thing conferred by the legislature. And it is, therefore, this agreement of the parties which the legislature assumes to destroy and annul.

As before remarked, these general laws are numerous. They authorize the formation of corporations for a great many purposes, literary, scientific, benevolent, as well as for business purposes ; insurance, railroad, gas companies and the like ; so that there is hardly any kind of enterprise which has not taken this form of association. Great numbers of persons have thus organized, and a large amount of money has been thus invested, and the aggregate of the pecuniary interests involved is enormous. To say that all this is held at the mercy of the legislature, that in its discretion (or want of discretion) it may dissolve all these corporations and compel the closing up of all the business through an army of receivers, seems to me to be a very dangerous doctrine. It is one to which I cannot assent. I prefer to think that the Constitution, by its provision for general laws and its prohibition of special acts, took this dangerous power from the legislature ; and that what the legislature is not to create it is not to destroy. The framers of the Constitution saw the evils which had arisen from the process of getting special acts of incorporation through the legislature. They could not have intended that these corporations, formed under general laws, should be obliged annually to protect themselves against the passage of special repealing acts. To appreciate the importance of the doctrine in question, one has only to consider what the effect would be of the introduction in the legislature of an act to annul and dissolve the New York Central and Hudson River Railroad Company, or any other great corporation. And the doctrine, if sound, affects not only such corporations as exercise a *quasi* public power, as railroad companies may be said to do, but it affects all manufacturing companies and companies of a similar character, which are, in every sense, private enterprises. So that any of these might be, at any moment, destroyed by the legislature for no cause whatever.

To illustrate these views, let us suppose that several persons unite and form a partnership for some manufacturing business. It would hardly be said that the legislature could annul and dissolve this partnership. But suppose that the members of this partnership avail themselves of the general law and form themselves into a

corporation. The effect of this would be to authorize the several persons to act as one, to give them succession, and in some degree to limit their individual liability. Is there any reason why the legislature should now have a power to annul and dissolve, which they did not have in regard to the partnership? These remarks are, perhaps, applicable with more force to a railroad corporation than to any other; because by article 3, section 18, of the Constitu tion the legislature is prohibited from passing any private bill granting to any corporation, association or individual the right to lay down railroad tracks; so that the power of special legislation to make this kind of corporation is altogether taken away.

One other suggestion may be made. If the legislature can, at its will, dissolve any corporation, then it can indirectly accomplish that special legislation which the Constitution forbids. For instance, let us suppose that there are five manufacturing corpora- tions engaged in a certain business. The legislature has only to dissolve four of them and the result is the possession by the remain- ing one of an exclusive corporate right. Thus the object of the constitutional provision would be destroyed; and we should have a return to the special creation of corporations by the legislature, with its attendant evils.

The Constitution intended to take from the legislature the power of granting special privileges or franchises, and to leave the whole subject to the enjoyment of all persons alike. This is still more plainly seen by article 3, section 18, which forbids the granting to any individual or corporation any exclusive privilege, immunity or franchise. If the legislature can take away franchises and priv- ileges from all except such individuals or corporations as it favors, this constitutional provision will be of little value.

No one disputes that a violation of duty may be a ground for forfeiting rights previously enjoyed by persons, natural or artificial. The question here is, can rights be taken away by the mere will of the legislature, without any cause shown? A statute passed to take away private rights is not legislation, whatever else it may be called. If, however, this corporation has been annulled and the receiver has been legally appointed, I agree fully with the views of my brother LANDON as to the rights of the respective parties to the action.

Judgment affirmed, without prejudice to any action of attorney-general respecting traffic contracts, with costs to respondents who are not also appellants.