By the Court.—O’Gorman, J.
At the close of the trial of this case, the relator applied to the trial judge for judgment in its favor. This motion was founded on the alternative writ of mandamus theretofore granted, on the return and supplemental return thereto, and on the findings of fact. The trial judge denied the application of the relator and closed his *455 opinion thus : “ Upon the whole case, the conclusion is inevitable that the right of the relator to the relief demanded is so doubtful that the application for a writ should be denied. The defendants are, therefore, entitled to a final order or judgment denying the application and dismissing the alternative writ with costs.”
After a careful examination of the findings, together with the briefs of the respective counsel on this appeal, and of the authorities cited by them, I am convinced that the conclusion arrived at by the learned trial judge is in all respects correct.
It is the indisputable rule of law that a peremptory writ of mandamus should never be granted unless in a case where its purpose is to give effect to a clear legal right. People ex rel. Mygatt v. Supervisors etc., 11 N. Y. 563; People ex rel. Perkins v. Hawkins, 46 lb. 9 ; People ex rel. Martin v. Brown, 55 lb. 191.
In the case at bar the right which the relator seeks to enforce is not only not free from doubt, but the weight of reason and authority is against it. The project which the relator in this case seeks to promote by the aid of a writ of mandamus is one which threatens the city of New York with serious disturbance and widespread inconvenience, with results of doubtful advantage. The occasion demands on the part of the court, great circumspection and caution, and thus the dictates of a wise forbearance unite with the principles of law in opposition to the relator’s demand.
No reason is apparent why the rights of the relator should not be ascertained and asserted by regular action at law, and no urgent necessity is shown for a resort to the sudden and peremptory interposition by mandamus. The order and adjudication of the trial judge are, in all things, affirmed for the reasons *456 set forth in his written opinion, the relator to pay the respondent’s costs of this appeal.
Sedgwick, Ch. J., concurred.
Note.—The special term opinion, above referred to, is as follows:—
“ Motion for final judgment in proceedings for a mandamus.
“ Fbeedman, J.:—Upon the alternative writ of mandamus heretofore granted, the return and supplemental return thereto, and the findl ings of the jury upon the issues, a motion is now made for final judgment. Each party claims to be entitled to such judgment.
“By stipulation it was agreed between the parties, that the present commissioner of public works and his successors are, from time to time, to be substituted as defendants, so that the judgment of the court may have full effect.
“ The findings of the jury are as follows, viz.:
“1. That the legislature of the state of New York, in 1868, passed an act known as chapter 230 of the Laws of that year.
“2. That the legislature of the state of New York, in 1869, passed an act known as chapter 824 of the Laws of that year.
“ 3. That on the 11th day of January, 1876, a judgment was entered in the Superior Court of the city of New York, in a certain action in said court for the foreclosure of a mortgage on the premises, property and rights of property hereinafter described, in which action Origen Vandenburgh was plaintiff, and The New York City Central Underground Railroad Company, John C. Brown, Jesse Seligman, Henry M. Alexander, and the Mayor, Aldermen and Commonalty of the city of New York were the defendants, and duly appeared therein.
“ 4. That it was adjudged in said judgment, as against the defendants, except the city of New York, that the said company owned certain property and rights of property therein described, namely the right of seizure, occupation and possession, for the purpose of constructing and maintaining an underground double track railway, of certain lands, premises and grounds, in the city of New York, in, on and under which the main line of the said railway is located, and which line extends from the City Hall park to and beyond Forty-fifth street by route described as follows, namely :
“ 5. Commencing in the City Hall park, on the easterly line of Broadway ; thence easterly passing in front and in rear of the old City Hall to Centre street; thence under and across Centre street to City Hall place; thence through City Hall place to Pearl street ; thence across Pearl street northeasterly in a curved line to or near Mulberry street at a point between Bayard and Park streets; thence northerly under Mulberry street to Bleecker street, and continuing northerly to and under Lafayette place to As tor place; thence northerly and easterly *457 under Astor place, Eighth street, and across the southeast corner of the block between Eighth and Ninth streets easterly of St. Ann’s Church, to and under Fourth avenue; thence northerly under Fourth avenue and Fourteenth street and Fourth avenue to and under Union Square; thence northerly in, under and through Union Square to and under Seventeenth street ; thence northerly bearing easterly in a straight line to and under and across Twenty-third street, to and in, under and through Madison Square and continuing northerly in, under, on, over and upon Madison avenue to and along the Harlem river.
“6. That it was adjudged in and by said judgment, against all of the defendants, except the city of New York, that such right of occupancy, seizure and possession continue from the date of the said judgment to the 17th day of April, 1968.
“ 7. That it was adjudged by and in said judgment as against all of the defendants, except the city of New York,' that the said last-named company had the right to enter into and upon the soil of said public grounds, pafcks and places for the purposes aforesaid freely and without molestation; to make such excavations in said streets, avenues, squares and grounds, as might be necessary from time to time; to construct and maintain the proper stations, platforms and buildings on such lands, premises and grounds, at such points along the route as might be most convenient for the ingress and egress of passengers and freight, and necessary for the operation of the company’s railway.
“ 8. That it was adjudged in and by said judgment that said mortgaged premises, franchises and property be sold at public auction according to law and the practice of the court, by or under the direction of a referee appointed in said action for that purpose, and with the several specific uses, rights and powers thereto belonging; and that the purchaser or purchasers on such sale be put into possession of the said premises, franchises and property, with the rights belonging thereto, on production of the referee’s deed for the same.
“9. That the referee, mentioned in the said judgment, on the 8th day of February, 1876, duly sold at public auction the premises, franchises, property and rights of property in the said judgment mentioned to Origen Vandenburgh and Hervey Sheldon, and on the 7th day of March, 1876, conveyed the same to the said purchasers by deed dated on that day and recorded in the office of the register of the city and county of New York in Liber 1350 of Conveyances, at p. 459, on the 18th day of March, 1876.
“ 10. That on the 19th day of July, 1880, pursuant to chapter 469 of the Laws of 1873, as amended by chapter 113 of the Laws of 1880, the said Origen Yandenburgh and Hervey Sheldon duly associated with them other persons pursuant to said act, duly organized a corporation under the name of the New York Underground Eailway Company, and filed *458 with the secretary of state of the state of New York and the county clerk of the county of New York, pursuant to such statutes, articles of association of the said last-mentioned company.
“11. That said last-mentioned corporation duly succeeded to and became possessed of all the titles, rights, powers, franchises, privileges, immunities, easements, liberties, property and rights of property, which had theretofore belonged to the said The New York City Central Underground Railway Company.
“ 12. That on the 6th day of September, 1880, by deed dated on that day and duly recorded in the office of the register of the city and county of New York on the 18th day of September, 1880, in Liber 1554 of Conveyances, at page 466, the said Origen Vandenburgh and Hervey Sheldon duly conveyed to The New York Underground Railway Company the premises, franchises, property and rights of property so ■ as aforesaid conveyed to them by the referee.
“13. That on the 4th day of February, 1887, the said the New York Underground Railway Company made application to. John Newton, the then commissioner of public works of the city of New York, for a permit from the department of public works to open one or more streets of the city of New York on a part of the route aforesaid, which application was, on the 4th day of March, 1887, modified by a further written communication to said Newton, on the part of the said company, limiting the portion of the route so proposed to be opened to Lafayette place in said city.
“ 14. That on the 6th day of July, 1887, the said John Newton, commissioner of public works, refused to issue such permit.
“15. That on the 8th day of February, 1888, the said New YorkUnderground Railway Company made a further written application to the said commissioner of public works, for a permit to open the streets on the line of the company’s aforesaid railway, between the City Hall and Forty-fifth street, in the said city, which application was denied on or about the 20th day of February, 1888, by D. Lowber Smith, the then deputy commissioner of public works.
“ 16. That the said The New York City Central Underground Railway Company and the said The New York Underground Railway Company have not, nor has either of them, obtained the consent of the owners of one-half in value of the property bounded on the line of the proposed route of said railroad.
“ 17. That they have not, nor has either of them, obtained the consent of the board of aldermen of the city of New York.
“18. That they have not obtained the consent of the ownerg.of property bounded on the line of the said proposed route.
.“19. That the general term of the district in which the city of New York is situated has not appointed three commissioners, as required by chapter 582 of the Laws of 1880.
“ 20. That by the route and plans adopted by each of the railroads re *459 ferred to, or mentioned in the foregoing findings, it became necessary or proper for the corporations to build a portion, or some portion, of their road underground.
“ Originally the relator company demanded of the commissioner of public works a permit to open the streets along its route, and included therein Broadway, between Seventeenth and Twentieth streets, and to this demand it adhered in its application for an alternative writ. Such writ, when issued, corresponded with the demand. Upon the trial of the issues it was held by the trial judge, that no right to enter upon Broadway was granted to the company, and he therefore directed a finding, defining the route in terms which exclude Broadway. The variance, it is now claimed, is fatal to the application of the relator, for the reason that it is a well established principle of law, that a peremptory mandamus cannot be issued otherwise than in exact accordance with the alternative writ and the demand made upon the officer, whose action is to be coerced.
“In the next place it is contended that the franchise granted by the Acts of 1868 and 1869 has been forfeited by non-user and lapse of time.
“ I do not stop to consider either of the two objections referred to. The first is of too technical a character, in view of the other important questions involved and which would have to be met on a new application, and the second is now in course of direct litigation, in the action brought by the attorney-general.
“ A third and more important objection, is that the relator company has not obtained the consent of a majority of the owners of the property abutting on the streets, nor the consent of the local authorities.
“ By chapter 582 of the Laws of 1880, section 1, it is provided that, ‘whenever, according to the route and plans adopted by any railroad company heretofore or hereafter formed under any special act of the legislature of this state, or under chapter 140 of the Laws of 1850, entitled ‘ an Act to authorize the formation of railroad corporations and to regulate the same,” and all acts supplementary thereto or amendatory thereof, for the building of its railroad, it shall be necessary or proper to build said road, or any part of the same underground, or to tunnel or bridge any river or waters, it shall be lawful for said company to enter upon, &c., * * * ; provided that whenever such road, or any part of the same, is intended to be built within the limits of any city * * * in this state, and to run by means of a tunnel underneath any of the streets, roads or public places thereof, the said company, before building the same underneath any of the said streets, roads or public places, shall obtain the consent of the owners of one-half in value of the property bounded on the line, and the consent of * * * the proper authorities having control of said streets, roads or public places; or in case such consent of the owners of property bounded on the line cannot be obtained, the general term of the Supreme Court, in the district in which said city * * * is situated, may, upon *460 application, appoint three commissioners, who shall determine, after a hearing of all the parties interested, whether said railroad ought to be allowed to be built underneath such street, roads and public places, or any of them, and in what manner the same may be so built with the least damage to the surface, and to, the use of the surface by the public, and the determination of said commissioners, confirmed by the court, may be taken in lieu of the said consent of the said authorities and property owners.’ This Act of 1880, has been held by the Court of Appeals to be unconstitutional in so far as it provides that an order of the general term may be taken in lieu of the consents of the local authorities and of the owners of one-half in value of the property bounded on the line. Matter of New York District Railway, 107 N. Y. 54. But in so far as the act provides that a tunnel or underground railway shall not be built without the consent of such property owners and local authorities, it remains unaffected by that decision, and the conditions prescribed by it are obligatory upon all railroad companies covered by its provisions. The relator seeks to avoid the application of this statute to its railway by two arguments, namely: (1.) That the relator company has not been formed under any special act of the legislature, or under the general railroad act, or any act supplementary thereto or amendatory thereof, and therefore is exempt from the provisions of the Act'of 1880; and (2.) That the Act of 1880, even if otherwise applicable, is unconstitutional and void as against the relator, because by imposing the condition of procuring the assent of the property owners and of the local authorities as a condition of exercising a franchise previously granted, it impairs the obligation of the contract embraced in the franchise previously granted and destroys vested rights.
“It is conceded that the relator company was formed under the provisions of chapter 469 of the Laws of 1873, which authorize the purchaser or purchasers of franchises and property of corporations sold by foreclosure of mortgage, to associate other persons with them and to form a corporation to which the franchises, powers and privileges sold under the mortgage may be conveyed. In the case at bar Vandenburgh and Sheldon, the purchasers at the foreclosure sale of the property, franchises, powers and privileges of the New York City Central Underground Bailway Company, associated other persons with them, and pursuant to the Act of 1873, created the relator company and conveyed to it all the property, franchises, powers and privileges of the former company so purchased by them.
“ The answer to the first argument of the relator is, however, that the Act qf 1873 is an act supplementary to the general railroad act of 1850, although its title makes no reference to the last named act. The provisions of the Act of 1873 originated in chapter 282 of the Laws of 1854, which is entitled ‘ An Act to amend the act'entitled 1 An Act to authorize the formation of railroad corporations, and to regulate the same,’ *461 passed April 2,1850. In this Act of 1854, provisions were first enacted that the purchasers of railroad franchises under foreclosure judgments might associate with themselves other persons, and thereupon become a corporation possessing the powers, privileges and franchises conveyed by and under the decree of foreclosure. Prior to the enactment of that act, the difficulty had arisen that individual purchasers of railroad franchises, possessing in themselves no corporate powers, and failing to acquire by the decree and sale of foreclosure the right to be a corporation, and to succeed to the corporate life of the former corporation, found themselves in the awkward predicament of owning a property which they could not use and might not be able to sell. It was to cure the difficulty, as was said by Judge Finch in The People v. The Brooklyn, Flatbush & Coney Island Railway Co., 89 N. Y. 84, that the Act of 1854, and its subsequent amendments, were enacted. Now it may be said that the Act of 1854 was confined in its operation to railroad corporations, and that the Act of 1873 is a general act applicable to all corporations. The fact, nevertheless, is that the Act of 1873 is, as to railroad corporations, supplementary to the railroad acts. Whether an act is amendatory or supplementary to the general railroad act, is to be determined by its provisions and not by its title. Even if it be conceded, therefore, that the Act of 1873 is not amendatory in the strict legal acceptation of that term, it is sufficient that it is supplementary to the general railroad act, and that the relator company was organized under it, although its right to construct the railroad in question may have been derived from other sources. There is nothing in chapter 10 of Laws of 1860 which, in my judgment, militates against the views so far expressed. But there are additional reasons in support of what has already been said. ‘ The New York City Central Underground Railway Company, organized under chapter 230 of the Laws of 1868, was, by the third section of said Act, expressly subjected to all the provisions of the Act, entitled ‘ An Act to authorize the formation of railroad corporations and to regulate the same,” passed April 2d, 1850, and the several Acts amendatory thereof and additional thereto, &c,’ The amendatory Act passed as chapter 824 of the Laws of 1869, made no change in this respect. This being so, and the rule being well settled, that under the foreclosure of a mortgage the purchaser can secure no greater rights than would accrue to him under and by virtue of a deed conveying all the right, title and interest of both the mortgagor and the mortgagee, and that a decree of foreclosure does not affect rights prior and paramount to those of the mortgagor and mortgagee, it is difficult to see how, in the absence of proof of a further and additional grant, the relator company can claim any greater rights than the New York City Central Underground Railway Company possessed. If there was such a further and additional grant, clear and convincing proof of it should be given. But no such proof was given.
*462 “ The answer to the second argument of the relator is as follows, viz: The corporate franchises, powers and privileges to which the relator has succeeded, originated in the Act of 1868, chapter 230, and by section 3 of that Act the corporation was subject to the provisions of the general railroad act. Section 1 of the general railroad act provides that the corporations organized thereunder shall be subject to the provisions contained in title 3 of chapter 18 of the first part of the revised statutes, and among the provisions therein contained is this: ‘ The charter of every corporation that shall hereafter be granted by the legislature, shall be subject to alteration, suspension or repeal in the discretion of the legislature.’ (§ 8). Section 48 of the general railroad act of 1850, also provides: 1 The legislature may at any time annul or dissolve any corporation formed under this Act.’ And Section 1 of Article 8 of the Constitution provides: ‘ Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the object of the corporation cannot be obtained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed.’ The power reserved by these statutory enactments and the constitutional provision referred to, is ample to authorize the legislature to impose the additional condition upon the relator that, before building its railroad, it should procure the consent either of the local authorities or of the property owners, or both. A different case would be presented if the road had been built upon the faith of the original franchise, and the condition were sought to be imposed subsequently. But as long as work has not been commenced, the legislature does not undertake to deprive the corporation of any power. It simply imposes a condition for the exercise of the power, and such condition is of a nature calculated to serve the public welfare, and is a proper regulation in respect to the exercise of a franchise affecting the public. Thus in the case of The People, ex rel., The New York Electric Lines Company v. Rollin M. Squire as Commissioner, &c., 107 N. Y. 593, it appeared that the relator company had acquired the franchise of laying electrical conductors in the streets of the city of New York under resolutions of the common council and Acts of the legislature, and that subsequently chapter 499, of the Laws of 1885, was passed, by which it was provided that such electrical conductors should not be laid except with the consent of a certain board of electrical control created by statute. It was held that the Act of 1885, so far as it affects corporations organized before its passage, is not obnoxious to the constitutional prohibition against laws impairing the obligations of contracts; that it does not annul, destroy, or materially impair or restrict, any franchises or contract rights previously secured, but seeks to regulate and control their-exercise, so that they shall cease to constitute a public nuisance; that regulations of such a character are strictly police regulations, and that the right to exercise *463 this police power is a governmental function which cannot be alienated, surrendered or abridged by the legislature, by any grant, contract or delegation whatsoever. In the ease of The Mayor, etc., v. The Twenty-third Street Railway Co., 113 N. Y. 811, the legislature had required a street railroad corporation to pay into the treasury of the city of New York one per cent of its gross receipts, instead of paying a license fee upon each car as had heretofore been prescribed. The company resisted the payment of the percentage. It was held that while, under the power reserved, the legislature cannot deprive a corporation of its property or annul its contracts with third persons, it may take away its franchises to be a corporation or prescribe the conditions and terms upon which it may live and exercise such franchise, and that consequently the Act imposing the duty to pay a percentage was a valid and constitutional exercise of legislative power. So, a law changing the charter of a railroad company so that the city of Rochester, which as a stockholder had theretofore been entitled to name four directors out of thirteen, became entitled to appoint seven, which gave the control of the company to said city, was adjudged by the Supreme Court of the United States to be constitutional and valid, Miller v. The State, 15 Wall. 478. The cases already referred to are deemed sufficient to illustrate the proposition that the Act of 1880 is not unconstitutional and void for any of the reasons advanced by the relator. It is only the rights of third parties vested in contracts with a corporation, that the legislature cannot destroy by directing the dissolution of the corporation and the sale of its property. The People, etc., v. O’Brien, 111 N. Y. 1. The further claim of the relator that the condition imposed by the Act of 1880, requiring the consent of the owners of one-half in value of the property bounded on the line, is itself unconstitutional, because section 18 of article III of the Constitution requires the consent of the owners of one-half in value of the property bounded on that portion of a street or highway upon which it is proposed to construct or operate a railroad, which has been construed in Hilton v. The 34th Street R. R. Co., 1 How. Pr. N. S. 453, to mean the owners of one-half of each street, is also untenable, because that constitutional provision did not go into effect until January 1, 1875, and is applicable only to franchises to be thereafter granted, and because the rights and liabilities of the relator derive their origin from a date prior to that time. See Matter of Gilbert El. Ry., 70 N. Y. 361; People v. Brooklyn, F. & C. I. R. R. Co., 89 lb. 75.
“ The third objection, which has been sufficiently discussed, should, therefore, be. sustained. But even if there were error in this, there is a fourth objection which is fatal to relator’s case as it stands at present. It is that the relator has shown neither a clear legal right, nor the necessity for the issuance of the writ at the present time.
“ Aside from the question of forfeiture by non-user and lapse of time, on account of which an action has been brought by the attorney-general *464 for the dissolution of the relator company, which action is still pending, and from the question of variance, which questions I do not stop to determine, but which nevertheless involve a doubt, the relator’s case is left uncertain by reason of its failure to adduce any proof that it is its intention in good faith to construct, maintain and operate the road on the line proposed, and that it has or controls sufficient pecuniary means to perform the work. The defendants raised and persisted in the objection from the very start. In the Matter of the Metropolitan Transit Co., 111 N. Y. 588, it was held by the Court of Appeals that the application of the company for the appointment of commissioners of appraisal to fix the compensation to be paid by the company to the city of New York for the use of certain streets, was not sufficient evidence of an intent on the part "of the company to build the road in good faith, and that good faith on the part of the company in that respect is made essential by the Act of 1850 (chap. 140, § 14). This being so, upon an application for a mandamus to coerce like in the present case, the action of an official who denies the good faith and pecuniary ability of the applicant, it is in the very nature of things part of the case of the applicant to show good faith. Such an application differs materially from an application for the appointment of commissioners to determine whether a road shall be built at. all, and if so, to prescribe and define the character, location and route of the road. For if the mandamus in the present ease were issued and enforced, as it must be presumed it would be, the streets might be excavated, and the work then stopped for want of power to proceed farther, and thus a great public nuisance might be created. The proposed road was laid out largely as an underground road through private land. All the authorities agree that such land has an indefinite extent, downwards as well as upwards, so as to include everything terrestrial under and over it. The legal maxim is ‘ Oujus est solum, ejus est usque ad coelum.’ The owners of this land are entitled to compensation. This has been conceded on the argument. Why then should not the relator company be compelled to show that, if it were permitted to tear up the streets, no delay would be incurred by the resistance of such owners ? All things considered, it is quite reasonable to require in this case that the relator should show good faith and sufficient ability to proceed with the work with due diligence from the time of the granting of the permit for the excavation of the streets.
‘1 Another element of uncertainty arises from the failure of the relator to define the route with sufficient precision. It should have defined the route with such precision, that the commissioner of public works in his permit might have defined the portions of the- streets to- be opened.
“The Act of 1869 defines a route, touching Mulberry street, between Bayard and Park streets, continuing either east or west of Mulberry street, or through Mulberry street; passing from Seventeenth street *465 to Twenty-third street, either through the blocks between Broadway and Fourth avenue, or through to Madison avneue, if it be extended southerly; and continuing under Madison avenue, or east of the avenue, in whole or in part, to Eighty-sixth street, etc., etc. The description of the route thus given is sufficient for the purpose of incorporating a railroad company which, like the relator or its predecessor, the New York City Central Underground Bailway, is authorized by section 22 of the general railroad act, to define its route within"the general limits indicated by the statute.
“But preliminary to the commencement of actual work, and especially preliminary to an application for legal assistance in the excavation of the streets, the relator is bound to file a map, by which its route is specifically defined, and by which it is determined and fixed, whether its line is to be within the streets named, or east or west thereof, and at what points its route is to intersect the streets. The findings of the jury contain no such definition or specific determination. Nor does any such definition or specific determination appear anywhere else in the ease. In the absence, therefore, of all proof upon these points, no court will grant a mandamus, compelling the commissioner of public works to issue a permit for the excavation of the streets in general terms. The duty of keeping the streets of the city of New York in order is in a large measure cast by law upon the commissioner, and this involves the duty of being vigilant, to prevent all unnecessary encroachments upon, and obstructions of, the streets. When, therefore, the commissioner is applied to for a permit for the excavation of any part of a street, it is both his right and his duty to insist upon exact information as to the precise point at which the excavation is proposed to be made.
“ The considerations stated clearly demonstrate that the relator has ■shown neither a clear legal right to, nor the necessity for, the issuance of the writ at the present time. The, writ lies to give effect only to a clear legal right. The People, etc., v. The Supervisors of Chenango County, 11 N. Y. 563, and The People, etc., v. Hawkins, Supervisor, etc., 46 lb. 9.
There are other questions in the case, but, in view of what has already been said, it is not necessary to examine them.
“Upon the whole case the conclusion is inevitable, that the right of the. relator to the relief demanded is so doubtful that the application for a writ should be deniéd. The defendants are, therefore, entitled to a final order or judgment, denying the application and dismissing the alternative writ" with costs.”